IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:15cv368–MHT |
| | ) | (WO) |
| STATE OF ALABAMA and ALABAMA DEPARTMENT OF CORRECTIONS, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

CONSENT DECREE

It is ORDERED that all parties are enjoined and restrained from failing to comply with this consent decree, which replicates the parties' settlement agreement (doc. no. 2-1).

## I.   INTRODUCTION

1. The State of Alabama, the Alabama Department of Corrections ("ADOC"), and the United States of America enter into this Agreement with the goal of ensuring that inmates at the Julia Tutwiler Prison for Women are provided with constitutional

1

conditions that protect them from sexual abuse and sexual harassment.

2. The Civil Rights Division of the United States Department of Justice commenced an investigation of allegations of sexual abuse and sexual harassment at Tutwiler pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA").

3. On January 17, 2014, the United States issued an investigative findings letter that concluded that certain conditions at Tutwiler violated inmates' constitutional rights ("Findings Letter") (attached as Appendix A).  Specifically, the United States concluded that ADOC violated the Eighth Amendment of the United States Constitution by failing to protect women inmates at Tutwiler from harm due to sexual abuse and sexual harassment from correctional staff.

4. DOJ acknowledges and appreciates the cooperation and good faith shown to the Department of Justice

and its representatives on the part of the Governor of Alabama, the Commissioner of the Alabama Department of Corrections, ADOC's leadership, and staff.  DOJ was given full access to Tutwiler's physical plant, its inmates, its staff, its vendors, and thousands of pages of documents requested by DOJ and its experts for review.  The Governor, Commissioner, and the ADOC's management team have demonstrated a commitment to improving conditions at Tutwiler for the women inmates who reside there and staff who work there and have devoted significant monetary and personnel resources towards making Tutwiler a safer facility and towards PREA compliance.  In March 2014, the Commissioner created a new position, Deputy Commissioner for Women's Facilities.  The primary mission of this new position is to provide executive and operational oversight of the management of women inmates in the custody of ADOC, specifically the Tutwiler Prison for Women,

Montgomery Women's Facility and Birmingham Work Release Center. Dr. Wendy Williams was appointed to be the first Deputy Commissioner of Women's Facilities on April 16, 2014. Since her appointment, Dr. Williams has dedicated her time to ensure that major changes were taking place at Tutwiler and at all of the ADOC's women facilities. ADOC will continue to seek sustainable improvements to promote positive outcomes for staff and the women they supervise.

5. DOJ recognizes Alabama and ADOC's high level of cooperation and willingness to enter into this Agreement without the need for litigation. As a result of this cooperation, DOJ, ADOC, and Alabama believe this Agreement represents the best opportunity to address the United States' concerns regarding sexual abuse and sexual harassment at Tutwiler.

6. Resolving this matter with this Agreement is in the best interests of the ADOC and Tutwiler inmates.

Pursuant to Fed. R. Civ. P. 41(a)(2), this Agreement will be filed in the United States District Court, Middle District of Alabama, together with a joint motion to conditionally dismiss the Complaint under the conditions set forth in this Agreement. This case will remain on the Court's inactive docket during the term of this Agreement. DOJ, ADOC, Alabama, or the Monitor may request status conferences to assist in informally resolving disputes, if needed. The Court will retain jurisdiction only to enforce the terms of this Agreement and to resolve disputes between DOJ, ADOC, and Alabama.

7. This Agreement shall be filed in the United States District Court, Middle District of Alabama. The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331; 28 U.S.C. § 1345; and 42 U.S.C. § 1997. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

8. This Agreement shall constitute the entire integrated Agreement of DOJ, ADOC, and Alabama. Except for the United States' January 17, 2014, Findings Letter, no prior or contemporaneous communications, oral or written, or prior drafts shall be relevant or admissible for purposes of determining the meaning of any provisions of the Agreement.

9. This Agreement is binding upon DOJ, ADOC, and Alabama, by and through their officials, agents, employees, and successors. This Agreement is enforceable only by DOJ, ADOC, and Alabama. No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement or any reports drafted, compiled, completed, or filed as a result of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement or any such reports. This

Agreement and any reports drafted, compiled, completed, or filed as a result of this Agreement are not intended to impair or expand the right of any person or organization to seek relief against the ADOC for its conduct or the conduct of ADOC employees; accordingly, they do not alter legal standards governing any such claims, including those under Alabama law. This Agreement and any reports drafted, compiled, completed, or filed as a result of this Agreement do not authorize, nor shall they be construed to authorize, access to any ADOC, contractor, or DOJ documents by persons or entities other than the DOJ, the ADOC, and the Monitor.

## II. <u>DEFINITIONS</u>

A.   "ADOC" means the Alabama Department of Corrections.[1]

---

1.  For purposes of this Agreement, the ADOC's commitments are limited to Tutwiler Prison for Women.

B.   "Compliance" is discussed throughout this Agreement in the following terms: substantial compliance, partial compliance, and non-compliance. "Substantial Compliance" indicates that ADOC and Tutwiler have achieved material compliance with most or all components of the relevant provision of the Agreement. "Partial Compliance" indicates that ADOC and Tutwiler have achieved material compliance on some of the components of the relevant provision of the Agreement, but significant work remains. "Non-compliance" indicates that ADOC and Tutwiler have not met most or all of the components of the relevant provision of the Agreement. "Material Compliance" requires that, for each provision, ADOC and Tutwiler have developed and implemented a policy incorporating the requirement, trained relevant personnel on the policy, and relevant personnel are complying with the requirement in actual practice.

8

C.  "Contractor" means a person who provides services on a recurring basis pursuant to a contractual agreement with the State of Alabama or ADOC.

D.  "Corrections staff" means all ADOC employees and contractors, irrespective of job title, whose regular duties include the supervision and control of inmates throughout Tutwiler.

E.  "Document" is defined to include any designated documents or electronically stored information - including writings, handwritten notes, letters, emails, memoranda, policies, procedures, protocols, curricula, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations - stored in any medium from which information can be obtained either directly or, if necessary, after translation by ADOC and Alabama into a reasonably usable form.  A draft or non-identical copy is a separate document within the meaning of this term.

F.  "DOJ" shall refer to the United States Department of Justice, which represents the United States in this matter.

G.  "Employee" means a person who works directly for ADOC or Tutwiler.

H.  "Exigent circumstances" means any set of temporary and unforeseen circumstances that require immediate action in order to combat a threat to the security or institutional order of Tutwiler.

I.  "Effective Date" shall mean the date the Agreement is signed by DOJ, ADOC, and Alabama.

J.  "Gender dysphoria" is when a person's gender at birth is contrary to the one they identify with.

K.  "Gender nonconforming" means a person whose appearance or manner does not conform to traditional societal gender expectations.

L.  "Gender-responsive principles" reflect operational practices in a prison setting based on empirical and gender based differences.  Being gender-responsive means adopting the principles, training

employees, and creating and maintaining a prison environment that is grounded in evidence based practice, experience, research, and theory that acknowledges women's pathways into the criminal justice system and addresses issues such as history of sexual and physical abuse, violence, family relationships, substance abuse, mental illness and co-occurring disorders.

M.  To "implement" a policy means:  the policy has been drafted and disseminated to all staff responsible for following or applying the policy; all relevant staff have been trained on the policy; compliance with the policy is monitored and tracked through compliance tools; the policy is consistently applied and followed, as demonstrated by the compliance tools; and there are corrective action measures to address lapses in application of the policy.

N.  "Include" or "including" means "include, but not be limited to" or "including, but not limited to."

O.  "Inmate" means any person incarcerated or detained at Tutwiler or any facility that is built or used to replace Tutwiler.

P.  "Intersex" means a person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical definitions of male or female.  Intersex medical conditions are sometimes referred to as disorders of sex development.

Q.  "Medical Practitioner" means a health professional who, by virtue of education, credentials, and experience, is licensed (if required by law) and permitted to evaluate and care for patients within the scope of his or her professional practice.

R.  "Mental Health Practitioner" means a mental health professional who, by virtue of education, credentials, and experience, is licensed (if required by law) and permitted to evaluate and care for patients within the scope of his or her professional practice.

12

S.    "Monitor" means an individual selected to oversee implementation of the Agreement.

T.    "Pat-down search" means a running of the hands over the clothed body of an inmate by an employee to determine whether the individual possesses contraband.

U.    "PREA" means the Prison Rape Elimination Act of 2003 and implementing regulations, 28 C.F.R. pt. 115.

V.    A ``qualified medical practitioner'' means a health professional who, by virtue of education, credentials, and experience, is licensed (if required by law) and permitted to evaluate and care for patients within the scope of his or her professional practice and who has also successfully completed specialized training for treating sexual abuse victims.

W.    A ``qualified mental health practitioner'' means a mental health professional who, by virtue of education, credentials, and experience, is

licensed (if required by law) and permitted to evaluate and care for patients within the scope of his or her professional practice and who has also successfully completed specialized training for treating sexual abuse victims.

X. "Real-time video monitoring" means a staff member is assigned to monitor video feeds contemporaneously with recorded events and has the capacity to intervene or cause intervention in an emergency to ensure the protection and safety of inmates and/or staff.

Y. "Sexual abuse" includes:

1. Sexual abuse of an inmate by a staff member, includes any of the following acts, with or without consent of the inmate:

    i. Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

    ii. Contact between the mouth and the penis, vulva, or anus;

14

iii. Contact between the mouth and any body part where the staff member has the intent to abuse, arouse, or gratify sexual desire;

iv. Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument, that is unrelated to official duties or where the staff member has the intent to abuse, arouse or gratify sexual desire;

v. Any other intentional contact, either directly or through the clothing of, or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or where the staff member has the intent to abuse, arouse or gratify sexual desire;

vi. Any attempt, threat, or request by a staff member to engage in the activities

15

described    in    paragraphs    (i)-(v)
immediately above;

vii. Any display by a staff member of his or
her uncovered genitalia, buttocks, or
breast in the presence of an inmate; and

viii. Voyeurism by a staff member.

2. Sexual abuse of an inmate by another inmate,
including any of the following acts, if the
victim does not consent, is coerced into such act
by overt or implied threats of violence, or is
unable to consent or refuse:

i.   Contact between the penis and the vulva or
the penis and the anus, including
penetration, however slight;

ii.  Contact between the mouth and the penis,
vulva, or anus;

iii. Penetration of the anal or genital opening
of another person, however slight, by a
hand, finger, object, or other instrument;
and

iv. Any other intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks of another person, excluding contact incidental to a physical altercation.

Z. "Sexual harassment" includes:

1. Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate directed toward another; and

2. Repeated verbal comments or gestures of a sexual nature to an inmate by a staff member including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

AA. "Shift relief factor" means the number of full-time equivalent staff needed to fill a relieved post

(one that is covered on a continuous basis) for a single shift.  Four basic variables are considered in determining the shift relief factor:  how often and how long posts are to be filled; number of days per week posts are authorized to be filled; whether the post must be relieved to keep it filled during the shift (e.g., meal relief, scheduled breaks); and leave and absence patterns of the workforce, including both paid and unpaid leave.

BB. "Staff" or "staff member" includes all persons who are assigned to work at Tutwiler or provide services to inmates at Tutwiler, including corrections staff, medical practitioners, mental health practitioners, and employees of any agency of the State, and including contractors and volunteers who provide services at Tutwiler without pay.

CC. "Strip search" means a search that requires a person to remove or arrange some or all clothing

so as to permit a visual inspection of the person's breasts, buttocks, or genitalia.

DD. "Substantiated allegation" means an allegation that was investigated and determined to have occurred.

EE. "Supervisory staff" means any staff member who has the responsibility to oversee the work of another staff member or inmate or groups of staff or inmates and includes anyone that ADOC designates as having the responsibility to oversee the work of another staff member and/or inmate or group of staff and/or inmates.

FF. "Train" means that qualified instructors educate employees in the skills, knowledge and/or abilities addressed to a level at which the trainee has the demonstrated proficiency to implement those skills as, and when called for, in the training. "Trained" means a demonstration of staff proficiency through documented testing or other means.

GG. "Transgender" means a person whose gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned sex at birth.

HH. "Tutwiler" refers to the Julia Tutwiler Prison for Women located in Wetumpka, Alabama and includes all buildings located on the Tutwiler campus.

II. "Unfounded allegation" means an allegation that was investigated and determined not to have occurred.

JJ. "Unsubstantiated allegation" means an allegation that was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred.

KK. "Volunteer" means an individual who donates time and effort on a recurring basis to enhance the activities and programs of ADOC.

LL. "Voyeurism" by a staff member means an invasion of privacy of an inmate by staff for reasons

unrelated to official duties, such as peering at an inmate who is using a toilet to perform bodily functions; requiring an inmate to expose her buttocks, genitals, or breasts; or taking images of all or part of an inmate's naked body or of an inmate performing bodily functions.

### III. <u>SUBSTANTIVE PROVISIONS</u>

ADOC and Tutwiler shall take all actions necessary to comply with the substantive provisions of this Agreement detailed below in order to prevent, detect, and respond to allegations of sexual abuse and sexual harassment at Tutwiler. Compliance with the Agreement will be measured both by whether the technical provisions are implemented and whether women at Tutwiler are provided a safe and secure environment free of sexual abuse and sexual harassment as required by the United States Constitution.

### A. General Policies and Procedures

ADOC and Tutwiler shall develop and implement gender-responsive policies, procedures, and practices to ensure that inmates at Tutwiler are protected from harm due to sexual abuse and sexual harassment. Accordingly:

1. ADOC and Tutwiler shall comply with all provisions of PREA. ADOC and Tutwiler shall continue to comply with the ADOC's written policies and procedures mandating zero tolerance toward all forms of sexual abuse and sexual harassment. This Agreement takes precedence over any ADOC and/or Tutwiler policy governing the operation of Tutwiler and that may conflict with this Agreement.

2. ADOC and Tutwiler shall develop, submit to the Monitor and DOJ for review consistent with Section III.A.6., and implement policies and procedures regarding the management of lesbian, gay, bisexual, transgender, intersex, and gender nonconforming inmates. The policy shall

emphasize the rights of lesbian, gay, bisexual, transgender, intersex, gender nonconforming and gender dysphoric inmates to a safe, non-discriminatory and respectful environment and shall include the following:

i. A qualified mental health practitioner with experience in recognizing and diagnosing co-existing mental health concerns and distinguishing these from gender dysphoria, knowledge about gender non-conforming identities and expressions and the assessment and treatment of gender dysphoria, should be assigned inmates with gender non-conforming identities, including gender dysphoric inmates;

ii. An inmate diagnosed with gender dysphoria should be offered appropriate non-surgical treatment as determined by a qualified health care practitioner; and

iii. ADOC and Tutwiler shall provide ADOC-issued clothing and hygiene items and facilities appropriate to the needs of transgender and gender dysphoric inmates.

3. ADOC and Tutwiler shall continue to comply with its policy that ensures women receive essential supplies, including hygiene and feminine hygiene products, tampons and pads; linens; and uniforms by making them available on a monthly basis or more frequently as needed. The policy will continue to require the tracking and distribution of these products. ADOC and Tutwiler will continue to ensure that both tampons and sanitary pads are readily available, free of charge, to Tutwiler inmates.

4. ADOC and Tutwiler shall develop and implement policies and procedures that incorporate gender-responsive strategies, including policies and procedures governing the use of force against women inmates and discipline of women inmates.

24

5. ADOC and Tutwiler shall continue to develop, submit to the Monitor and DOJ for review consistent with Section III.A.6., and implement facility-specific policies and operational practices specific to Tutwiler's population regarding the supervision and monitoring necessary to prevent inmates from being exposed to an unreasonable risk of harm from sexual abuse and harassment. The policies and practices must include:

   i. Post orders for first-line supervision of corrections staff for each housing unit in accordance with the operational practices developed;

   ii. Procedures regarding communication to and from corrections staff assigned to housing units;

   iii. The continued requirement of supervision by corrections staff assigned to all housing areas and dormitory settings,

including direct supervision of Dorm A, if that unit continues to be used for intake, and the administration of adequate rounds by corrections staff and security supervisors in all areas of the prison, including dormitories. Such rounds shall occur unannounced, at least every hour, inside each general population housing unit and at least once every 30 minute period for special management inmates, or more often if necessary. Video surveillance may be used to supplement, but must not be used to replace rounds by correctional officers;

iv. The continued requirement that intermediate level or higher-level supervisors conduct and document unannounced rounds during both the day and night shifts to identify and deter staff sexual abuse and sexual harassment. Other

staff members should not be alerted that these rounds are occurring; and

v. The continued requirement to document all security rounds on forms or logs that do not contain pre-printed rounding times.

6. ADOC and Tutwiler shall revise and/or develop and implement, as necessary, any other policies, practices, procedures, protocols, training curricula, and other written documents, including but not limited to, screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.

i. ADOC and Tutwiler shall work together with the Monitor to draft new policies and procedures and/or revise existing policies and procedures pursuant to this Agreement. ADOC and Tutwiler will then send copies of such policies and procedures to DOJ for review and comment consistent with this Agreement.

ii. DOJ shall signify its approval, or provide any comments to ADOC and Tutwiler within 15 days of receipt of policies and procedures.

iii. ADOC and Tutwiler, in consultation with the Monitor, will consider DOJ's comments and input when determining whether to further revise the policies and procedures.

iv. If ADOC and Tutwiler choose not to incorporate DOJ's comments into further revisions, they will explain to DOJ in writing the reasons for doing so. While ADOC and Tutwiler should refrain from implementing policies and procedures during the period they are under review by DOJ, ADOC and Tutwiler need not postpone the implementation of any policies or procedures once they have received DOJ's

comments (or the 15 day period for
commenting expires).

B. Camera Management

The ADOC has implemented a state-of-the-art camera
system at Tutwiler, and contracted with an expert who
has conducted a review of the ADOC's Camera Plan,
including a review of each camera's placement.  As a
result of that review, cameras are strategically placed
to maximize supervision while protecting privacy.
Policies directing the appropriate use of cameras and
periodic staff training to ensure sustainability and
effective operation of the camera system will remain as
standard operational practice.

1. Camera Management policies and procedures will
   remain in effect at Tutwiler.

2. Camera management policies and procedures,
   including the locations where cameras have been
   placed, will be reviewed at least annually to
   ensure that they are serving their goal of

maximizing supervision.  To the extent that any changes to the Camera Management policies and procedures, or to a camera location, need to be made they will be made within 30 days of the completion of the annual review.  If a change cannot be made within 30 days, the reason for exceeding 30 days will be documented.

C. Staffing

In order to address low staffing levels and the need for more women officers, ADOC and Tutwiler shall ensure that correctional staffing and supervision is sufficient to adequately supervise inmates and staff and allow for the safe operation of Tutwiler. Accordingly:

1. Phase I:

   i. ADOC and Tutwiler shall continue to develop, submit to the Monitor and DOJ to assess for compliance with this Agreement, and implement its plan to recruit women

correctional officers at Tutwiler. To this end, ADOC shall:

1. Continue working with the Alabama Peace Officers Standards and Training Commission (APOSTC) in screening, selecting, or hiring applicants for the entry-level corrections officer positions until such standards, or any other physical test employed, are:

    a. Validated for a corrections environment; and

    b. Examined for the necessity of gender-norming certain components.

2. Continue to conduct physical fitness assessments on all correctional officer trainees, to include the provision of training recommendations to meet APOSTC physical training requirements.

3. Examine workplace practices such as mandatory overtime and shift length to assess whether any of those practices may negatively impact hiring and retaining women candidates.

ii. ADOC shall continue the practice of allowing officers from other ADOC facilities to serve overtime or otherwise be temporarily assigned at Tutwiler only after those officers have been trained as required by this Agreement.

iii. Within six months of the Effective Date, and every six months thereafter, ADOC and Tutwiler will provide to the Monitor and DOJ the numbers of men and women who have taken any required entry-level physical examination(s) and the results of any such tests broken down by gender for each test administration.

iv. ADOC shall continue to employ an upper-level, Department-wide PREA Coordinator with sufficient time and authority to develop, implement, and oversee its efforts to comply with the PREA standards at Tutwiler and all of its facilities.

v. ADOC and Tutwiler shall designate a full-time (40 hours/week) PREA Compliance Manager who has no other duties within ADOC or Tutwiler and who is assigned to oversee PREA compliance at Tutwiler. In addition, this person will work closely with the PREA Compliance Managers at Montgomery Women's Facility and Birmingham Work Release for consistency in women's services and monitor any other facility that is built to house women inmates on PREA-related matters. This individual will have sufficient authority to coordinate Tutwiler's efforts to comply

with the PREA standards. Further, ADOC and Tutwiler shall:

1. Ensure that Tutwiler's PREA Compliance Manager reports directly to the Warden or the Department-wide PREA Coordinator;

2. Develop, in policy, a job description for Tutwiler's PREA Compliance Manager with expected responsibilities, and submit this policy to the Monitor and DOJ for review consistent with Section III.A.6.;

3. Provide training to the Tutwiler PREA Compliance Manager necessary to fulfill his or her duties; and

4. Document the Tutwiler PREA Compliance Manager's activities.

2. Phase II:

    i. ADOC and Tutwiler shall develop, document, and implement a staffing plan, based on

34

gender-responsive principles and PREA requirements, that provides for adequate staffing levels and, where applicable, video monitoring, to protect inmates against sexual abuse and sexual harassment. This staffing plan shall be provided to the Monitor and DOJ and shall include the following:

1. Identification of all posts and positions at Tutwiler, including any gender-specific posts required for the safe operation of the facility;

2. Shift relief factor for Tutwiler;

3. Policies and procedures for reviewing and amending Tutwiler's staffing plan.

ii. In calculating adequate staffing levels, ADOC and Tutwiler shall, as part of a staffing analysis, consider:

1. Generally accepted detention and correctional practices;

2. ADOC and Tutwiler's determination of which necessary duties will be handled by Tutwiler staff, ADOC staff, or outside agencies;

3. Any findings of inadequacy from any investigative agencies within ADOC;

4. Any findings of inadequacy from internal or external oversight bodies;

5. The Camera Management Plan and all components of the facility's physical plant;

6. The composition of the inmate population;

7. The number and placement of supervisory staff;

8. Institution programming and options for supervision of inmates;

9. A Tutwiler specific shift relief-factor;

10. Any applicable state or local laws, regulations, or standards; and

11. The prevalence of substantiated and unsubstantiated incidents of sexual abuse and sexual harassment.

iii. Within nine months of the Effective Date, ADOC and Tutwiler shall submit this staffing plan and staffing analysis to the Monitor and DOJ for review and comment, and shall maintain the underlying data utilized in conducting the staffing analysis and plan and provide this data to DOJ or the Monitor if requested.

iv. Within one year of the Effective Date, ADOC and Tutwiler shall adopt the results of the staffing plan consistent with PREA standards.

v. ADOC and Tutwiler, in consultation with the Department-wide PREA Coordinator and Tutwiler's PREA Compliance Manager, shall

assess, determine, and document via a Staffing Update and Staffing Report, whether adjustments are needed to the staffing plan, and –taking into account available resources– implement such adjustments.

vi. The Staffing Update shall be provided to the Monitor and DOJ quarterly and shall include the following information:

1. A listing of staff hired at Tutwiler, by gender and positions filled; and

2. A listing of staff who ended their employment at Tutwiler, including gender, position, and reason for separation.

vii. The Staffing Report shall be provided to the Monitor and DOJ every six months in the first year after the Effective Date and yearly thereafter until termination of

this Agreement.  Each Staffing Report will
include the following information:

1.  An  evaluation  of  existing  staffing
    levels and need for adjustments;

2.  A  listing  of  each  post  and  position
    needed;

3.  The  number  of  hours  needed  for  each
    post and position;

4.  A listing of staff, by gender, working
    overtime at Tutwiler and the amount of
    overtime worked by each staff member;

5.  A  listing  of  supervisors  by  gender
    working overtime at Tutwiler; and

6.  Tutwiler's assessment of its ability to
    comply with the staffing plan.

viii. To  the  extent  such  policy  does  not
     already  exist,  the  ADOC  and  Tutwiler
     shall develop, submit to the Monitor and
     DOJ  for  review  consistent  with  Section

III.A.6., and implement a policy that includes:

1. That ADOC and Tutwiler not hire or promote, or enlist the services of anyone who may have contact with inmates, and shall not enlist the services of any contractor who may have contact with inmates at Tutwiler, who: (1) has engaged in sexual abuse or sexual harassment in a prison, jail, lockup, community confinement facility, juvenile facility, or other institution; (2) has been convicted of engaging or attempting to engage in sexual activity in the community facilitated by force, overt or implied threats of force, or coercion, or if the victim did not consent or was unable to consent or refuse; or, (3) has been civilly or administratively

adjudicated to have engaged in the activity described in this section. To this end, ADOC and Tutwiler shall:

a. Follow ADOC policy that requires that all new employees be asked about previous misconduct, as defined above in Subsection 1. This can be in written application or documented as part of an interview. ADOC policy shall be amended to state the same in regards to promotions.

b. Perform a criminal background records check; and

c. Contact all prior institutional employers for information on substantiated allegations of sexual abuse and sexual harassment or any resignation during a pending investigation of

**41**

an allegation of sexual abuse and sexual harassment.

2. ADOC and Tutwiler shall conduct criminal background records checks at least once every five years for current employees and respond to any relevant results of those checks as described in Section III.K below.

3. ADOC and Tutwiler shall conduct criminal background records checks at least once every five years for contractors who may have contact with inmates. For any current ADOC staff temporarily assigned to Tutwiler for regular or overtime duty, Tutwiler will create a system to manage and track any allegations of sexual harassment or sexual abuse made against them at the ADOC facility they are assigned to.

4. Consistent with ADOC policy, employees have an affirmative duty to disclose any previous sexual abuse and sexual harassment, as described in Subsection 1. above. Material omissions of such information shall be grounds for termination.

5. ADOC and Tutwiler will conduct an initial criminal records check on all Tutwiler volunteers. Any volunteer with a background that includes engaging in sexual abuse may not be utilized as a volunteer. At least every five years, Tutwiler and ADOC will perform an additional criminal background check on all current volunteers.

ix. When ADOC or any other governmental entity responsible for collective bargaining on ADOC's behalf contracts for services with individuals, private agencies or other

entities, including other government agencies, they shall include in any new contracts or contract renewals the entity's obligation to adopt and comply with Tutwiler's policies and procedures governing sexual abuse and sexual harassment.

x. ADOC and/or Tutwiler policies and procedures require that contractors and volunteers who have contact with inmates but are not directly supervised by ADOC or Tutwiler employees comply with Tutwiler's sexual abuse and sexual harassment policies and procedures.

D. Training

ADOC and Tutwiler shall ensure that all staff have the adequate knowledge, skill, and ability to prevent, detect, and respond to sexual abuse and sexual harassment at Tutwiler, and to manage, interact, and communicate appropriately with women inmates and

lesbian, gay, bisexual, transgender, and gender nonconforming inmates.   Accordingly:

1. Staff Training:   ADOC and Tutwiler shall train all staff who may have contact with inmates on the following:

    i.  Its zero-tolerance policy for sexual abuse and sexual harassment;

    ii. How to fulfill its responsibilities under its sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures;

    iii. Inmates' right to be free from sexual abuse and sexual harassment;

    iv. The right of inmates and employees to be free from retaliation for reporting sexual abuse and sexual harassment;

    v.  The dynamics of sexual abuse and sexual harassment in confinement;

    vi. The common reactions of sexual abuse and sexual harassment victims;

vii. How to detect and respond to signs of threatened and actual sexual abuse;

viii. How to respond to sexual abuse and sexual harassment, including:

1. How to respond effectively and professionally to victims of sexual abuse and sexual harassment;

2. How and to whom to report allegations or suspicions of sexual abuse and sexual harassment, including how to comply with relevant laws related to mandatory reporting of sexual abuse to outside authorities; and

3. How to preserve physical evidence of sexual abuse (this provision does not apply to volunteers).

ix. How to avoid inappropriate relationships with inmates;

x. Gender-responsive principles, including those applicable to the use of force

46

against women inmates (the provision regarding use of force does not apply to volunteers); and

xi. How to communicate effectively and professionally with inmates, including lesbian, gay, bisexual, transgender, intersex, and gender nonconforming inmates, including the use of appropriate name and pronoun for an inmate's gender presentation and identity. This training shall emphasize that verbal abuse-including name calling and the use of racially insensitive or offensive, profane or vulgar language-will not be tolerated.

2. Within six months of the Effective Date, all staff shall have received training as set out in Section III.D.1.

3. ADOC and Tutwiler shall provide annual refresher training to all staff to ensure that they know the current sexual abuse and sexual harassment

47

policies and procedures. If staff cannot successfully demonstrate knowledge of these policies and procedures, they shall not be permitted to have any contact with inmates until such time as they can demonstrate proficiency. ADOC and Tutwiler shall have and implement policies and procedures setting forth the levels of discipline, up to and including termination, for any staff member who cannot perform his or her job duties due to a failure to demonstrate proficiency in these policies and procedures.

4. The Monitor will work with the ADOC and Tutwiler in drafting new training materials and/or revising current training materials set out in Section III.D.1 and 3.

5. ADOC shall certify and document to Tutwiler's PREA Compliance Manager, the Department-wide PREA Coordinator, the Monitor, and DOJ, that all staff have been trained.

E. Inmate Education

ADOC and Tutwiler shall effectively and meaningfully communicate to all inmates their right to be free from sexual abuse and sexual harassment and the protections in place at Tutwiler to ensure that such abuse and harassment does not occur or, if it does occur, is reported so it can be responded to promptly, appropriately, and without retaliation. Accordingly:

1. ADOC and Tutwiler shall ensure that, during the intake process, all inmates receive information regarding the following:

   i. ADOC's zero-tolerance policy regarding sexual abuse and harassment;

   ii. Definitions of sexual abuse and sexual harassment;

   iii. The right to be free from sexual abuse and sexual harassment and from retaliation for reporting such incidents;

   iv. The right to be free from verbal abuse, including name calling, racially

insensitive or offensive language, and profane or vulgar language;

v. How to report incidents or suspicions of sexual abuse and harassment, including the availability of non-inmate interpreters; and

vi. The process of accessing medical and mental health care.

2. Within 14 days of intake, ADOC and Tutwiler shall provide comprehensive orientation education to inmates either conducted in-person or through a video presented by an in-person facilitator regarding their rights to be free from sexual abuse and sexual harassment and to be free from retaliation for reporting such incidents, and regarding their policies and procedures for responding to such incidents.

3. Current Tutwiler inmates will receive the information and education described in III.E.1 and 2 within three months of the Effective Date.

50

4. ADOC and Tutwiler shall ensure that the individual conducting or facilitating the comprehensive inmate educational orientation is trained on Tutwiler and ADOC's policies and procedures related to sexual abuse and sexual harassment, the PREA standards, and the terms of this Agreement.

5. The individual conducting or facilitating the comprehensive inmate orientation education shall remain in the room during the entire orientation and shall monitor the inmates for reactions to and understanding of the information. A mental health practitioner will serve as an advisor to the orientation process and services will be available during the orientation process if indicated.

6. Consistent with current policy, ADOC and Tutwiler shall ensure that the information outlined in III.E.1 and III.E.2 is conveyed and made available in formats accessible to all inmates,

including those who are limited English proficient, deaf, visually impaired, or otherwise disabled as well as to inmates who have limited reading skills.

7. ADOC and Tutwiler shall provide the Monitor and DOJ for their review consistent with Section III.A.6. any materials or curriculum utilized to satisfy the requirements of III.E.1 and III.E.2.

8. ADOC and Tutwiler shall maintain documentation of inmate participation in the education sessions required by III.E.2.

F. Gender-Responsive Classification

Consistent with constitutional standards, ADOC and Tutwiler shall develop and implement a classification process including custody classification, and risk/need assessment, and screening for risk of vulnerability or perpetration of sexual abuse or sexual harassment and use that information to inform housing, bed, work, education, and program assignments with the goal of maximizing safety. Accordingly:

1. Within two months of the Effective Date, ADOC shall convene a working group to evaluate methods to decrease or eliminate Tutwiler's use of Dorm A for a period of time that exceeds 48 hours while screenings are completed, including an examination of the necessity of PAP test and/or other medical, mental health, or intellectual test results prior to classification and any failures to provide adequate continuity in medical and mental health care to Dorm A residents.

2. Within six months of convening of the working group, ADOC and Tutwiler shall retain an expert in gender responsive assessment and classification. The retained expert shall develop and submit for review to the Workgroup and Monitor for a summary of recommendations and proposed deliverables that outline a plan for implementation and validation of an objective and

internal classification system specific to the women inmates at Tutwiler. The classification system shall incorporate gender responsive principles and address the needs of women inmates at Tutwiler, including housing safety, mental health (depression/anxiety/ psychosis), abuse and trauma, family conflict, relationship dysfunction, and parental stress. The system will also focus on strength or resiliency factors including educational assets, family support, and self-efficacy. The proposed plan shall also examine the designation of "restricted status" for inmates at Tutwiler to determine the appropriateness of the designation as it relates to classification, housing, programming, and community custody. The proposed plan shall be based on expert review and address adjustments to the classification system, adequate data collection and analysis, and appropriate ongoing testing for effectiveness.

3. The approved plan for implementation of the classification system shall be managed by an implementation workgroup and completed within two years of the approval of the plan.

4. Based on the implemented assessment processes, the system shall provide programs that incorporate gender responsive principles and address the needs of women inmates at Tutwiler, including those addressing sexual abuse, sexual harassment, and trauma; domestic violence; dating violence; and medical and mental health care.

G. Risk Assessment

1. ADOC and Tutwiler shall continue to utilize a risk assessment instrument to screen for risk of victimization and abusiveness.  Such process shall include the following:

    i. Ensure that Tutwiler initiates and documents communication with the facility from which the inmate is received to learn about their incarceration, adjustment

55

issues, disciplinary history, and any other factors relevant to identification of potential predators and victims including pregnancy status. If an inmate arrives at Tutwiler from another custodial institution, including a county jail, **work release placement, or half-way house** - the transferring facility shall be notified if it is suspected, as a result of either the inmate's self-reporting or after the initial medical evaluation, that sexual abuse in a custodial setting could have caused the pregnancy.

ii. All inmates shall be assessed during an intake screening within 72 hours of arrival. The screening shall include an assessment of an inmate's risk of being sexually abused by other inmates, or sexually abusive toward other inmates;

iii. The intake screening shall include, at a minimum, the following criteria to assess inmates for risk of sexual victimization:

1. Whether the inmate has a mental, physical, or developmental disability;

2. The age of the inmate;

3. The physical build of the inmate;

4. Whether the inmate has previously been incarcerated;

5. Whether the inmate has a history of substance abuse and/or alcohol dependency;

6. Whether the inmate has a history of self injurious behavior and/or suicidal ideation;

7. Whether the inmate's criminal history is exclusively nonviolent;

8. Whether the inmate has prior convictions for sex offenses against an adult or child;

9. Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;

10. Whether the inmate has previously experienced sexual victimization;

11. The inmate's own perception of vulnerability; and

12. Any other factors that have been selected for Tutwiler.

iv. In assessing inmates for risk of being sexually abusive, the initial screening shall consider prior acts of sexual abuse, prior convictions for violent offenses, and history of prior institutional violence and/or sexual abuse;

v. Within a set time period, not to exceed 30 days from the inmate's arrival at Tutwiler, Tutwiler shall reassess the inmate's risk of victimization or abusiveness based upon a trauma screening

58

and assessment developed under Section III. F.2 and any additional, relevant information received by Tutwiler since the intake screening;

vi. An inmate's risk level shall be reassessed when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness;

vii. If the screening indicates that an inmate has experienced prior sexual victimization or perpetrated sexual abuse, whether it occurred in an institutional setting or in the community, staff shall ensure that the inmate is offered a follow-up with a medical or mental health practitioner within 14 days of the intake screening;

viii. ADOC and Tutwiler shall use information from the risk screening to make an

individualized and safety-based determination of prisoners' housing, bed, work, education, and program assignments; and

ix. Placement and programming assignments for inmates at high risk of sexual victimization shall be reassessed at least twice each year to review any threats to safety experienced by the inmate and such inmate's own views with respect to her own safety shall be given serious consideration.

2. Inmates at high risk for sexual victimization shall not be placed in involuntary segregated housing due to their high risk of victimization unless an assessment of all available alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers. Such an assessment and determination

shall be documented, explaining the basis for Tutwiler's concern for the inmate's safety and the reason why no alternative means of separation can be arranged. A review of such determination must be afforded each inmate at least every 30 days to determine whether there is a continuing need for separation from the general population.

3. Inmates placed in segregated housing due to potential victimization shall, to the extent possible, have full access to programs, privileges, education, and work opportunities as inmates in general population housing.

H. Inmates' Right to Privacy

ADOC and Tutwiler shall prevent officers from unnecessarily viewing inmates who are naked or performing bodily functions. Accordingly:

1. Cross-Gender Searches

   i. ADOC and Tutwiler shall comply with its policy regarding cross-gender pat and strip searches and shall ensure that

appropriate modifications to the policy are made and implemented to include, at a minimum, the items specified in III.H.1.ii to III.H.1.v below.

ii. Tutwiler will continue to not conduct cross-gender strip searches or visual body cavity searches (meaning a search of the anal or genital opening) except in exigent circumstances or when performed by medical practitioners.

iii. Tutwiler will continue to prohibit cross-gender pat-down searches of women inmates, absent exigent circumstances. Inmates' access to regularly available programming or other out-of-cell opportunities shall not be restricted in order to comply with this provision.

iv. Tutwiler shall document all cross-gender strip searches, cross-gender visual body cavity searches, and cross-gender pat-down

searches of women inmates, and shall document the exigent circumstances that warranted the search.   To the extent any such searches were conducted, Tutwiler shall provide this documentation to the Monitor and DOJ on a quarterly basis.

v. ADOC and Tutwiler shall train security staff in how to conduct cross-gender pat-down searches, and searches of transgender and intersex inmates, when required, in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs.

2. Cross-Gender Viewing

i. ADOC and Tutwiler shall develop, submit to the Monitor and DOJ for review consistent with Section III.A.6., and implement policies and procedures that enable inmates to perform bodily functions –such as showering, bathing, and using the

toilet– and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks. Such policies and procedures shall require staff of the opposite gender to announce their presence before entering an inmate housing unit and again before entering the shower or toilet areas.

ii. ADOC and Tutwiler shall develop, submit to the Monitor and DOJ for review consistent with Section III.A.6., and implement policies and procedures regarding the method of conducting inmate counts. This policy and procedure shall limit inmate movement during inmate counts and shall prohibit the practice of conducting inmate

counts while inmates are likely to be in the shower and toilet areas.

3. ADOC and Tutwiler shall continue to implement its plan to address the architectural features that contribute to a lack of privacy for inmates while showering or using the toilet.

4. ADOC and Tutwiler shall not search or physically examine a transgender or intersex inmate for the sole purpose of determining the inmate's genital status. If the inmate's genital status is unknown, it may be determined during conversations with the inmate or by a qualified medical practitioner reviewing the medical records or, if necessary, by learning that information during the intake physical exam conducted in private by a medical practitioner.

5. Transgender and intersex inmates shall be given the opportunity to shower separately from other inmates.

I. Reporting Allegations of Sexual Abuse and Sexual Harassment

In order to adequately identify and respond to all instances of sexual abuse and sexual harassment at Tutwiler, ADOC and Tutwiler shall ensure that inmates, staff, and third-parties have multiple unimpeded methods to report incidents of sexual abuse and sexual harassment free from retaliation. Accordingly:

1. ADOC and Tutwiler shall continue to comply with its policy on reporting allegations of sexual abuse and sexual harassment. Any modification of that policy shall be submitted to DOJ and the Monitor for review consistent with Section III.A.6. ADOC and Tutwiler shall provide multiple internal methods, including a grievance process and at least one confidential method, for inmates to report sexual abuse and sexual harassment, retaliation by other inmates or staff for reporting sexual abuse and sexual harassment, and staff neglect or violation of

66

responsibilities that may have contributed to such incidents. The inmate reporting system must include:

    i. Provisions for accepting reports made verbally, in writing, anonymously, and from third parties including other inmates, Tutwiler staff, and the inmate's friends and family, advocates or legal representation. In the case of reports made verbally, staff shall promptly document those reports in writing; and

    ii. Information on how to report sexual abuse or sexual harassment on behalf of an inmate shall be distributed publicly.

2. ADOC and Tutwiler shall also provide at least one way for inmates to report abuse or harassment to a public or private entity or office that is not part of the agency, and that is able to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials,

allowing the inmate to remain anonymous upon request. The preferred method provided should be through a toll-free number, or other method as agreed.

3. ADOC and Tutwiler shall provide a method for staff to confidentially report sexual abuse and sexual harassment of inmates.

4. Third parties shall be permitted to assist inmates in filing requests for administrative remedies relating to allegations of sexual abuse and sexual harassment, and shall also be permitted to file such requests on behalf of inmates.

5. All third party reports of sexual abuse and sexual harassment shall be forwarded immediately to the Departmental PREA Coordinator and be investigated and processed in accordance with ADOC policy. As part of this process, the Departmental PREA Coordinator will inform

68

Tutwiler's PREA Compliance Manager of all third party reports received.

6. Grievances

    i. ADOC and Tutwiler shall continue to develop and submit policies and procedures for an inmate Grievance System to the Monitor and DOJ for review within three months of the effective date and, within four months of the effective date, implement the inmate Grievance System. This policy shall clearly prohibit retaliatory practices by staff against inmates who file a grievance and should include the requirements listed in III.I.6.ii-ix below.

    ii. ADOC and Tutwiler shall ensure that all inmates receive orientation on the Grievance System during orientation. The ADOC will offer quarterly education on the Grievance System throughout the first year

of implementation. Inmates will be required to attend at least once.

iii. During the first year of implementation, ADOC and Tutwiler shall ensure that all staff receive training on the Grievance System upon implementation and through annual in-service training.

iv. ADOC and Tutwiler shall ensure that grievance forms are available on all units. ADOC and Tutwiler shall assist inmates who are limited English proficient, visually impaired, have a mental health impairment, are otherwise disabled, or who have limited reading or writing skills in accessing the grievance system.

v. ADOC and Tutwiler shall ensure that an inmate, who alleges sexual abuse or sexual harassment, or any other verbal or physical abuse by staff, may submit a

complaint without submitting it to a staff member who is the subject of the complaint, and such complaint is not referred to a staff member who is the subject of the complaint.

vi. ADOC and Tutwiler shall not require an inmate to use any informal grievance process, or to otherwise attempt to resolve with staff, an alleged incident of sexual abuse, sexual harassment, or any other verbal or physical abuse by staff.

vii. ADOC and Tutwiler shall issue a final decision on the merits of any portion of a complaint alleging sexual abuse, sexual harassment, or any other verbal or physical abuse by staff, within 30 days of the initial filing of the complaint, with the option of an extension of up to an additional 30 days, approved and documented by the facility designee, with

written notice of status update provided
to the inmate.

viii. ADOC and Tutwiler shall develop, submit
to the Monitor and DOJ for review
consistent with Section III.A.6., and
implement policies and procedures for the
filing of an emergency grievance where an
inmate is subject to a substantial risk
of imminent sexual or physical abuse.

ix. After receiving an emergency oral or
written complaint alleging an inmate is
subject to a substantial risk of imminent
sexual or physical abuse, ADOC and
Tutwiler shall immediately forward the
grievance (or any portion that alleges
the substantial risk of imminent sexual
or physical abuse) to a level of review
at which immediate corrective action may
be taken, shall provide an initial
response within 48 hours, and shall issue

a final decision within five calendar days. The initial response and final agency decision shall document the ADOC's and/or Tutwiler's determination whether the inmate is in substantial risk of imminent sexual or physical abuse and the action taken in response to the emergency grievance.

7. ADOC and Tutwiler shall require all employees to report immediately:

    i. Any knowledge, suspicion, or information regarding an incident or alleged incident of sexual abuse or sexual harassment that occurred in Tutwiler, in transport vehicles, or in any off-site facilities under the control and supervision of ADOC or Tutwiler;

    ii. Retaliation against inmates or staff who reported such an incident; and

iii. Any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

8. Apart from reporting to designated supervisors or officials, staff shall not reveal any information related to a sexual abuse or sexual harassment report to anyone other than to the extent necessary to make treatment, investigation, and other security and management decisions.

9. ADOC and Tutwiler shall report all allegations of sexual abuse and sexual harassment, including third party reports, anonymous reports, and inmate grievances, to Tutwiler's or ADOC's designated investigator.

10. Protecting Inmates and Staff from Retaliation:

i. Consistent with ADOC policies, ADOC and Tutwiler shall protect all inmates and staff who report allegations of sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment

investigations from retaliation by other inmates or staff, and shall designate Tutwiler's PREA Compliance Manager with monitoring allegations of retaliation concerning inmates. Allegations of retaliation against employees will be investigated and processed in accordance with ADOC personnel policy.

ii. ADOC and Tutwiler shall employ multiple protection measures, such as housing changes or transfers for inmate victims or abusers, removal of alleged staff or inmate abusers from contact with victims, and emotional support services for inmates or staff who fear retaliation for reporting sexual abuse or sexual harassment or for cooperating with investigations.

iii. ADOC and Tutwiler shall ensure that any Tutwiler staff who is alleged to have

75

engaged in sexual abuse or sexual harassment are immediately removed from positions of inmate contact at Tutwiler until an investigation is concluded.

iv. ADOC and Tutwiler shall monitor all inmates and staff who report sexual abuse or sexual harassment and inmates who have been reported to have suffered or cooperated with sexual abuse or sexual harassment investigations from retaliation by other inmates or staff for at least 90 days following a report of sexual abuse or sexual harassment, to see if there are changes that may suggest possible retaliation by inmates or staff, including inmate disciplinary reports, housing or program changes, and negative performance reviews or reassignments, and shall act promptly to remedy any such retaliation. ADOC and Tutwiler shall continue such

> > monitoring beyond 90 days if the initial
> > monitoring indicates a continuing need.
> > In the case of inmates, such monitoring
> > shall also include periodic status checks.
>
> > v.  If any other individual who cooperates
> > with an investigation expresses a fear of
> > retaliation, ADOC and Tutwiler shall take
> > appropriate measures to protect that
> > individual against retaliation.

J. Official Response to an Allegation of Sexual Abuse
   and Sexual Harassment

ADOC and Tutwiler shall ensure that all alleged
victims of sexual abuse and sexual harassment are
offered timely, unimpeded access to medical treatment
and crisis intervention services as appropriate and
that staff appropriately respond to and counsel the
alleged victim while taking steps to preserve evidence.
Accordingly:

> 1. When ADOC or Tutwiler learns that an inmate may
>    be subject to a substantial risk of imminent

sexual abuse, ADOC or Tutwiler shall take immediate action to protect the inmate.

2. ADOC and Tutwiler shall continue to comply with ADOC policy and Tutwiler Standard Operating Procedures to coordinate actions taken in response to an allegation of sexual abuse, among first staff responders, medical and mental health practitioners, investigators, and Tutwiler leadership, including time frames and lists of whom staff should report to in specific situations and guidelines regarding the collection of physical evidence.

3. ADOC and Tutwiler shall respond to reports of sexual abuse and sexual harassment or threats of sexual abuse or sexual harassment without regard to an inmate's known or perceived sexual orientation or gender identity.

4. The written institutional plan shall include procedures that address how staff respond upon learning of an allegation that an inmate was

sexually abused.  The first security staff member to respond to the report shall be required to:

   i.   Separate the alleged victim and abuser;

  ii.   Preserve and protect any crime scene until appropriate steps can be taken to collect any evidence; and

 iii.   Request that the alleged victim not take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating if the abuse occurred within a time period that still allows for the collection of physical evidence.

5. If the first staff responder is not a security staff member, the responder shall be required to request the alleged victim not take any actions that could destroy physical evidence, and then notify security staff.

6. ADOC and Tutwiler shall not place in protective custody an inmate who is alleged to have suffered sexual abuse or sexual harassment solely for the purpose of protecting that inmate, unless a determination, documented in writing and reviewed by the PREA Compliance Manager or the warden's designee within 24 hours, has been made that there is no available alternative means of separation from likely abusers.

7. To the extent they do not already exist, ADOC and Tutwiler shall develop, submit to the Monitor and DOJ for review consistent with Section III.A.6., and implement policies and procedures to provide access to medical and mental health services to women identified as potential or actual victims of sexual abuse and sexual harassment, that occurred either at Tutwiler or elsewhere, including the following:

   i. Inmate victims of sexual abuse shall receive timely, unimpeded access to

emergency medical and mental health care and treatment and crisis intervention services, the nature and scope of which are determined by medical and mental health practitioners according to their professional judgment;

ii. If no qualified medical or mental health practitioners are on duty at the time a report of recent abuse is made, security staff and first responders shall take preliminary steps to protect the victim and shall immediately notify the appropriate medical and mental health practitioners;

iii. Tutwiler shall offer further medical and mental health evaluation and, as appropriate, treatment, to all inmates who have been victimized by sexual abuse and/or sexual harassment in any prison, jail, lockup, or juvenile facility;

81

iv. The evaluation and treatment of such victims shall include, as appropriate, follow-up services, treatment plans, and, when necessary, referrals for continued care following their transfer to, or placement in, other facilities, or their release from custody;

v. ADOC and Tutwiler shall ensure appropriate mental health counseling and emotional support services are made available to victims of sexual abuse and sexual harassment, provided by a qualified staff member or a victim advocate from a community-based organization that provides services to sexual abuse victims;

vi. ADOC and Tutwiler shall attempt to enter into and maintain memoranda of understanding or other agreements with community service providers that are able to provide inmates with confidential

82

emotional support services related to sexual abuse or sexual harassment. ADOC and Tutwiler shall maintain copies of agreements or documentation of attempts.

vii. Inmate victims of sexual abuse or sexual harassment while incarcerated shall be offered timely information about and timely access to emergency contraception, pregnancy tests, and tests for sexually transmitted infections prophylaxis, where medically appropriate;

viii. If inmate pregnancy results from sexual abuse while incarcerated, such victims shall receive timely and comprehensive information about and access to all lawful pregnancy-related medical services; and

ix. All treatment services in this subsection shall be provided to the victim without financial cost and regardless of whether

83

the victim names the abuser or cooperates
with any investigation arising out of the
incident.

K. Referrals and Investigations

ADOC and Tutwiler shall ensure that all
allegations of sexual abuse and sexual harassment are
promptly, thoroughly, and objectively investigated and
appropriately referred for prosecutorial review, and
that alleged victims are advised of the outcome of
their allegations.  Accordingly:

1. ADOC investigators shall continue to investigate
   allegations of sexual abuse or sexual harassment
   consistent with their authority as criminal
   investigators and consistent with ADOC policy and
   Alabama law. Completed investigations of sexual
   abuse and sexual harassment will be referred to
   local prosecutors as appropriate.

2. When ADOC conducts its own investigations into
   allegations of sexual abuse or sexual harassment,
   it shall do so promptly, thoroughly, and

objectively for all allegations, including third party and anonymous reports. Administrative investigations shall be completed regardless of the results of any criminal investigations and regardless of the subject's continued employment by ADOC.

3. The use of pre-hearing segregation shall be limited to inmates whose continuing behavior is a threat to facility safety, or who will not stop the prohibited behavior. Such pre-hearing segregation shall not be used for more than 72 hours, at which time an inmate must be afforded a disciplinary hearing, or provided a written explanation of why the hearing is postponed and when the hearing will be re-scheduled.

4. ADOC and Tutwiler shall develop, submit to the Monitor and DOJ for review consistent with Section III.A.6., and implement guidelines for the immediate initiation of an investigation and/or review upon learning of an allegation of

85

sexual abuse or sexual harassment and develop a process for monitoring those guidelines. The guidelines shall also ensure that investigations that include any allegations of sexual abuse or sexual harassment are properly labeled as such.

5. Where sexual abuse or sexual harassment is alleged, ADOC shall use investigators who have received special training in institutional sexual abuse and sexual harassment investigation. Specialized training shall include techniques for interviewing sexual abuse victims, proper use of *Miranda* and *Garrity* warnings, sexual abuse evidence collection in confinement settings, and the criteria and evidence required to substantiate a case for administrative action or prosecution referral. ADOC shall maintain documentation that agency investigators have completed the required specialized training in conducting sexual abuse investigations. The Department-wide PREA Coordinator and Tutwiler's

PREA Compliance Manager shall not serve as investigators for sexual abuse investigations.

6. Investigators shall gather and preserve direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data; shall interview alleged victims, suspected perpetrators, and witnesses; and shall review prior complaints and reports of sexual abuse and sexual harassment involving the suspected perpetrator.

7. The credibility of an alleged victim, suspect, or witness shall be assessed on an individual basis and shall not be determined by the person's status as inmate or staff. ADOC or Tutwiler are prohibited from offering or administering polygraph examinations or other truth-telling devices to an inmate who alleges sexual abuse or sexual harassment.

8. ADOC shall issue a written investigative report within 30 days after the conclusion of a sexual abuse or sexual harassment investigation that indicates whether the allegation is substantiated, unsubstantiated, or unfounded. The investigator may request in writing, approved by the facility designee, an extension for cause that identifies the remaining actions necessary to complete the investigation.  In no case shall the investigation be unfounded solely due to the expiration of the 30 days.  The investigative report shall include an effort to determine whether staff actions or failures to act contributed to the abuse, a description of the physical and testimonial evidence, the reasoning behind credibility assessments, and investigative facts and findings.

9. ADOC shall work with the Monitor on ensuring that an investigative summary sheet that provides an overview of the current status of an

investigation is included. The summary information should include, among other things, basic information such as staff name(s), prisoner names(s), location of incident, and the time of day.

10. The departure of the alleged perpetrator or victim from the employment or control of ADOC or Tutwiler shall not provide a basis for terminating an investigation.

11. When outside agencies investigate alleged incidents of sexual abuse, ADOC and Tutwiler shall cooperate with outside investigators and shall endeavor to remain informed, to the extent appropriate, about the progress of the investigation.

12. Following an investigation into an inmate's allegation that she suffered sexual abuse or sexual harassment in any ADOC facility or while within the physical custody and control of the ADOC, ADOC and Tutwiler shall inform the inmate

as to whether the allegation has been determined to be substantiated, unsubstantiated, or unfounded.

13. If ADOC or Tutwiler did not conduct the investigation, it shall request the relevant information from the investigative agency in order to inform the inmate.

14. Following an inmate's allegation that a staff member has committed sexual abuse or sexual harassment against the inmate, ADOC and Tutwiler shall subsequently inform the inmate whenever:

   i. The staff member is no longer posted within the inmate's unit;

   ii. The staff member is no longer employed at Tutwiler; or

   iii. ADOC and/or Tutwiler learn that the staff member has been indicted or convicted on a charge related to sexual abuse within Tutwiler.

15. All such notifications or attempted notifications shall be documented.

16. A review team, including upper-level management officials at Tutwiler, with input from line supervisors, investigators, and medical and mental health practitioners, shall conduct an incident review within 30 days of the conclusion of every investigation of substantiated and unsubstantiated allegations of sexual abuse or staff-on-inmate sexual harassment. The review team shall:

   i. Consider whether the allegation or investigation indicates a need to change policy or practice to better prevent, detect, or respond to sexual abuse or staff-on-inmate sexual harassment;

   ii. Consider whether the incident or allegation was motivated by race; ethnicity; gender identity; lesbian, gay, bisexual, transgender, or intersex

identification,    status,    or    perceived

status; gang affiliation; or was motivated

or    otherwise    caused    by    other    group

dynamics at Tutwiler;

iii. Examine    the    area    in    Tutwiler    where    the

incident    allegedly    occurred    to    assess

whether physical barriers in the area may

enable abuse;

iv.  Assess the adequacy of staffing levels in

that area during different shifts;

v.   Review, by a warden or senior management,

the    personnel    file    of    any    involved

employees    to    assess    needs    in    background

screening, training, and/or supervision;

vi.  Assess    whether    monitoring    technology

should    be    deployed    or    augmented    to

supplement supervision by staff; and

vii. Prepare a report of its findings and any

recommendations for improvement and submit

such    report    to    the    Monitor,    DOJ,    the

Warden, the Department-wide PREA
Coordinator, and Tutwiler's PREA
Compliance Manager.

17. ADOC and Tutwiler shall implement the
recommendations for improvement or shall
document its reasons for not doing so.

18. Within 60 days of the Effective Date, ADOC and
Tutwiler shall review all pending
investigations alleging sexual abuse and sexual
harassment to determine whether the
investigation was conducted according to the
requirements of Section III. K. of this
Agreement. Within 120 days of the Effective
Date, ADOC and Tutwiler will conduct a similar
review of all unfounded allegations of sexual
assault and sexual harassment for the past 360
days to determine whether the investigation was
conducted according to the requirements of
Section III. K. of this Agreement.

L. Staff Disciplinary Actions

ADOC and Tutwiler shall take appropriate disciplinary action against staff found to have engaged in sexual abuse or sexual harassment or to have violated Tutwiler's policies and procedures regarding sexual abuse or sexual harassment.  Accordingly:

1. ADOC and Tutwiler shall develop, submit to the Monitor and DOJ for review consistent with Section III.A.6., and implement policies and procedures that track staff disciplinary actions related to allegations of sexual abuse or sexual harassment, to ensure that the directives in III.L.2-III.L.6 below are met.

2. ADOC and Tutwiler shall ensure prompt corrective action following any substantiated finding or recommendation resulting from either an administrative or criminal investigation surrounding an incident of sexual abuse or sexual harassment.  This will include, but not be limited to:

94

        i.   Documented   disciplinary   sanctions   of staff; and

       ii. Permanent removal of staff from the post where the incident occurred.

3. Staff shall be subject to disciplinary sanctions up to and including termination for violating ADOC's sexual abuse or sexual harassment policies.

4. Termination shall be the presumptive disciplinary sanction for staff who have engaged in sexual abuse.

5. Disciplinary sanctions for violations of agency policies relating to sexual abuse or sexual harassment (other than actually engaging in sexual abuse) shall be commensurate with the nature and circumstances of the acts committed, the staff member's disciplinary history, and the sanctions imposed for comparable offenses by other staff with similar histories.

95

6. All terminations for violations of ADOC's and Tutwiler's sexual abuse or sexual harassment policies, or resignations by staff who would have been terminated for sexual abuse or sexual harassment, if not for their resignation, shall be reported to local prosecutors, unless the activity was clearly not criminal in conformance with Alabama law, and to any relevant licensing bodies.

M. Limited English Proficient (LEP) Inmates

ADOC and Tutwiler shall work with the Monitor to develop and implement a policy providing for a method of interpretation services for LEP inmates. This method may be through a language telephone line, if necessary. ADOC and Tutwiler shall not rely on other inmates or non-certified employees to translate and/or interpret for LEP inmates.

IV. <u>QUALITY IMPROVEMENT AND DATA COLLECTION</u>

A. Within one year of the Effective Date, ADOC and Tutwiler shall develop and submit to the Monitor and DOJ for review consistent with Section III.A.6., and implement, written quality improvement policies and procedures adequate to identify and address any deficiencies in ADOC and Tutwiler's prevention, detection and response to sexual abuse and sexual harassment at Tutwiler and to assess and ensure compliance with the terms of this Agreement. These quality improvement policies and procedures shall include:

1. Required monthly quality assurance meetings;

2. Qualitative review procedures to ensure investigations of sexual abuse and sexual harassment conform to the requirements of this Agreement;

3. Data collection requirements, including:

   a. The procedures for data maintenance and collection for every allegation of sexual abuse and harassment;

b.   The sources for data collection including the data required by subsections IV.C., regarding inmate polling, and IV.D regarding data collection (below), documentation of announced and unannounced rounds, grievances, reports, investigation files, and incident reviews;

c.   The instrument(s) used to collect data;

d.   The standardized definitions used;

e.   The methodology employed to analyze the data; and

f.   Quality control mechanisms to verify data accuracy.

4. A requirement to create or modify and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities.

B. Within three months of the Effective Date, ADOC shall convene a state-wide working group to evaluate how

other state and ADOC entities may contribute to Tutwiler's compliance with this Agreement.

C. ADOC and Tutwiler shall establish a system wherein they routinely poll inmates regarding their perceptions of the implementation of the specific terms of this Agreement including the prevalence of staff sexual abuse and sexual harassment, inmate vulnerability to sexual abuse and sexual harassment, the investigation and discipline of staff accused of sexual abuse and sexual harassment, the efficacy of inmate education regarding sexual abuse and sexual harassment, privacy in the showers and toilets, the appropriateness of inmate classification, the levels of staff supervision, the efficacy of the reporting systems for sexual abuse and sexual harassment including grievances, and official responses to, and retaliation for, allegations of sexual abuse and sexual harassment.

D. ADOC and Tutwiler shall develop, implement, and maintain, in consultation with the Monitor, a Risk

Management System ("RMS") that will document and track facility trends related to:  (1) sexual abuse or sexual harassment; (2) unprofessional staff conduct involving inmates, including sexually explicit, vulgar, or degrading language; and (3) use of force incidents.  The RMS will consist of the data analysis described in this Section.  To this end, ADOC and Tutwiler shall:

1. Develop, implement, and maintain a tracking system to ensure that trends and incidents involving sexual abuse and sexual harassment are identified and corrected in a timely manner. ADOC and Tutwiler shall submit the proposed tracking system to the Monitor and DOJ for review consistent with Section III.A.6.

2. Collect, consolidate, analyze, track, and otherwise use its data to assist with the prevention of sexual abuse and sexual harassment. ADOC and Tutwiler data collection shall include:

    i.   **Number of inmate and third-party reports of:**

       1.  **sexual abuse at Tutwiler;**

       2.  **sexual harassment at Tutwiler;**

       3.  **staff presence in the shower and toilet areas of the bathrooms at Tutwiler;**

       4.  **unprofessional staff conduct involving inmates, including sexually explicit, vulgar, degrading, or racially insensitive or offensive language at Tutwiler;**

       5.  **Tutwiler staff located in areas other than their assigned posts; and**

       6.  **retaliatory treatment and threats to inmates or third-parties, including disciplinary actions or housing relocation;**

ii. **Number and names of Tutwiler staff, as well as staff assigned to Tutwiler on overtime, who:**

1. engaged in or allegedly engaged in sexual abuse at Tutwiler;

2. engaged in or allegedly engaged in sexual harassment at Tutwiler;

3. engaged in or allegedly engaged in use of force at Tutwiler;

4. allegedly violated ADOC and Tutwiler policies governing sexual abuse and sexual harassment;

5. allegedly violated the privacy rights of inmates at Tutwiler by entering the shower and toilet areas unannounced;

6. allegedly used sexually explicit, vulgar, degrading, or racially insensitive or offensive language on a frequent or repeated basis at Tutwiler;

7. allegedly were located in areas other than their assigned post at Tutwiler on a frequent or repeated basis;

8. were disciplined for actions at Tutwiler involving sexual abuse, sexual harassment, use of force, use of sexually explicit, vulgar, degrading, or racially insensitive or offensive language, or unprofessional staff conduct with inmates, including terminations, suspensions, and resignations; and

9. resigned while a sexual abuse or sexual harassment allegation, or other investigation, was pending at Tutwiler;

iii. Number of forensic medical exams, exams performed by sexual assault forensic examiners, and exams performed by sexual assault nurse examiners;

iv. Staffing levels, divided by gender, during different shifts, correlated to the number

of sexual abuse and sexual harassment allegations;

v.  Locations within Tutwiler where alleged sexual abuse and sexual harassment occurred;

vi. Length of stay for all inmates who are housed in Dorm A or other intake housing area prior to classification;

vii. Number of inmates who were held in or assigned to involuntary segregation because of a risk of sexual victimization for a period longer than 24 hours organized by length of stay;

viii. Number of inmates held in pre-hearing segregation and the length of time they spent there;

ix. Number and names of pregnant inmates at Tutwiler;

x.  Number of cross-gender strip, visual cavity, and pat-down searches;

xi.   Upon the implementation of a grievance system at Tutwiler, the number of all grievances, emergency grievances, and number of grievances referred to I&I for investigation;

xii.  Number of times ADOC or Tutwiler has determined that a Tutwiler inmate was subject to substantial risk of imminent sexual or physical abuse;

xiii. Number of administrative investigations initiated regarding allegations of sexual abuse or sexual harassment;

xiv.  Number of sexual abuse or sexual harassment investigations that involved extensions because a final decision had not been reached within 30 days;

xv.   Number of instances when inmate interpreters were used in connection with sexual abuse or sexual harassment allegations or investigations;

xvi. Total number of investigations, total number substantiated, total number unsubstantiated, and total number unfounded complaints of sexual abuse or sexual harassment;

xvii. Number of PREA related allegations from Tutwiler referred for criminal investigation and the number of criminal prosecutions;

xviii. Number of Tutwiler staff disciplined for on- or off-duty conduct consistent with departmental policy;

xix. Number of times an incident of retaliation occurred, consistent with PREA guidelines and involving Tutwiler staff or inmates; and

xx. ADOC, Tutwiler, and staff reports of training attendance, frequency, and evaluation measures.

3. Aggregate the data collected on a quarterly basis.

4. Review data collected and aggregated pursuant to Section IV.D in order to assess and improve the effectiveness of its sexual abuse and sexual harassment prevention, detection, and response policies, practices, and training, including by:

    i. Identifying potential patterns, changes, and problem areas (including for individual officers; for individual inmates; and for housing units); to include problems in Tutwiler's staffing levels, policies, practices, staff discipline system, and staff and prisoner training/education that might have contributed to those patterns if such patterns reflect increased sexual abuse and sexual harassment , decreased sexual abuse and sexual harassment detection, or

inadequate responses to sexual abuse and sexual harassment;

ii. Identifying staff or supervisors in need of retraining, performance plans, and discipline, while considering all aspects of the employee's assignment;

iii. Developing an array of intervention options to facilitate an effective response to identified problems;

iv. Taking corrective action on an ongoing basis; and

v. Preparing bi-annual reports of its findings and corrective actions, including a comparison to the findings in previous reports to assess progress.

5. The RMS will rely on the data analysis described above. All appropriate supervisors and investigative staff shall have access to this data described above.

i. Tutwiler's Warden shall use information from the RMS to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.

ii. Supervisors assigned to Tutwiler will assure that remedial activities are completed, as well as report if the intervention was effective in changing behaviors.

iii. The commissioner responsible for women's facilities or her designee will manage the RMS and will conduct quarterly audits of the RMS to ensure that analysis and intervention are working effectively, and to identify potential patterns or trends resulting in harm to inmates.

6. ADOC and Tutwiler will provide to the Monitor and DOJ on a bi-annual basis a list of all staff members identified through the RMS, and any

corrective action taken. On an annual basis, ADOC and Tutwiler shall conduct a documented review of the RMS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. ADOC and Tutwiler will document their review and conclusions and provide them to the Monitor and DOJ.

7. If three consecutive reports suggest that the Agreement's intended outcome may not be occurring, ADOC and Tutwiler shall convene a team, including the Monitor and representatives of DOJ, to consider modifications to Tutwiler's policies, procedures, and practices.

## V. IMPLEMENTATION

A. ADOC and Tutwiler shall begin implementing the requirements of this Agreement immediately upon the Effective Date.

B. Unless otherwise specified in this Agreement, ADOC and Tutwiler shall have fully implemented, including

the training of staff, all policies and procedures required under this Agreement within nine months of the Effective Date.  The Monitor may grant ADOC an extension of time to meet a particular deadline, not to exceed three additional months.

C. ADOC and Tutwiler shall revise and/or develop and implement, as necessary, any other policies, practices, procedures, protocols, training curricula, and other written documents, including but not limited to, screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.

D. If, during the course of this Agreement, the State of Alabama or ADOC decides to replace or supplement the physical structures at Tutwiler with other building(s), they shall notify the Monitor and DOJ and shall include the Monitor in any transition planning.

## VI. ADOC AND TUTWILER'S REPORTING REQUIREMENTS

A. ADOC and Tutwiler shall provide to the Monitor and DOJ a confidential bi-annual self-assessment compliance report until the Agreement is terminated, the first of which shall be filed within six months of the Effective Date.

B. Each self-assessment compliance report shall describe the actions ADOC and Tutwiler have taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at Tutwiler.

C. ADOC and Tutwiler shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the DOJ at all reasonable times for inspection and copying. In addition, ADOC and

112

Tutwiler shall maintain and submit upon request records or other documents to verify that they have taken such actions as described in their self-assessment compliance reports (e.g., census summaries, policies, procedures, protocols, training materials and incident reports) and will also provide all documents reasonably requested by DOJ.

## VII. DOJ'S RIGHT OF ACCESS

A. DOJ and its attorneys, consultants, and agents shall have access to Tutwiler, Tutwiler inmates, ADOC and Tutwiler staff and documents as is reasonably necessary to evaluate compliance with this Agreement. DOJ will provide written notice prior to any site visits.

B. ADOC shall promptly notify DOJ upon any substantiated findings of sexual abuse and sexual harassment, retaliation and/or injury requiring emergency medical attention related to an allegation and/or incident of sexual abuse or sexual harassment, including any

incidents of self-harm.  With this notification, ADOC and Tutwiler shall forward to DOJ any related incident reports and medical and/or mental health reports and investigations as they become available.

C. DOJ shall notify ADOC promptly of any information received that an inmate is at risk of harm.

## VIII. MONITORING

A. Selection and Autonomy of the Monitor:

1. DOJ, ADOC, and Alabama have jointly selected a Monitor, Jennie Lancaster, to assess and report whether the provisions of this Agreement have been implemented, and whether this implementation is resulting in a reduction of incidents of sexual abuse and sexual harassment and professional treatment of inmates.

2. The cost of the Monitor's fees and expenses will be borne by ADOC and Alabama.  ADOC will contract with the Monitor to provide these auditing services.  As part of that contract, a reasonable

budget will be agreed upon by and between ADOC and the Monitor to include a maximum dollar amount that can be spent in a given 12 month period. ADOC and Alabama will provide the Monitor with a budget sufficient to carry out the responsibilities described in this Agreement.

3. The Monitor shall only have the duties, responsibilities, and authority conferred by this Agreement. The Monitor shall be subjected to the supervision and orders of the Court, the Court's dismissal order, and applicable law.

4. Neither ADOC, Tutwiler, DOJ, nor any of their staff or agents shall have any supervisory authority over the Monitor's activities, reports, findings, or recommendations. The Monitor may be terminated only for good cause unrelated to the Monitor's findings and only with prior notice to, and approval of, Alabama, ADOC, and DOJ, acting jointly or by court order.

5. The Monitor may contract or consult with other persons or entities to assist in the evaluation of compliance. The Monitor will pay for the services out of his/her budget. The Monitor shall be permitted to engage in ex parte communications with Alabama, ADOC, Tutwiler, DOJ, and the Court regarding this Agreement.

B. Monitor's Access

1. The Monitor shall have full and complete access to Tutwiler, all Tutwiler documents and records, inmate medical and mental health records, staff, and inmates. The Monitor shall also have access to any ADOC documents or data she requests related to any facility built to supplement Tutwiler. ADOC and Tutwiler shall direct all employees to cooperate fully with the Monitor. All information obtained by the Monitor shall be maintained in a confidential manner.

2. Within seven days of receipt, the Monitor shall distribute to DOJ all documents, forms,

116

assessments, and reports submitted by ADOC or Tutwiler unless Alabama and ADOC have already distributed such items to DOJ.

C. Reporting

1. Within three months of the Effective Date, the Monitor will conduct a baseline site visit. As a result of the baseline site visit, the Monitor will design a monitoring plan. The baseline site visit will allow the Monitor to become familiar with the facility and this Agreement, and will allow the Monitor to inform ADOC, Tutwiler, and DOJ regarding what information the Monitor will require ADOC and Alabama to routinely report and with what frequency consistent with this Agreement.

2. The Monitor shall conduct an on-site inspection and issue a Compliance Report six months after the baseline visit, and then every six months thereafter. A draft Report shall be provided to ADOC, Tutwiler, and DOJ in draft form for comment

at least 30 days prior to its issuance.  ADOC,
Tutwiler, and DOJ shall provide comments, if any,
to the Monitor within 15 days of receipt of the
draft Report.  The Monitor shall consider the
responses of ADOC, Tutwiler, and DOJ and make
appropriate changes, if any, before issuing the
final Report.

3. The Compliance Reports shall describe the steps
   taken by ADOC and Tutwiler to implement this
   Agreement and evaluate the extent to which ADOC
   and Tutwiler have complied with each substantive
   provision of the Agreement.  Each Report:

   i. Shall evaluate the status of compliance
      for each relevant provision of the
      Agreement using the following standards:
      (1) Substantial Compliance; (2) Partial
      Compliance; and (3) Non-compliance.  The
      Monitor shall review a sufficient number
      of pertinent documents and interview a
      sufficient number of staff and inmates to

accurately assess current conditions.  The Monitor may also communicate with ex-inmates, family members, and relevant community members to assist the Monitor's assessment of current conditions;

ii. Shall describe the steps taken by each member of the monitoring team to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings;

iii. Will contain the Monitor's independent verification of representations from ADOC and Tutwiler regarding progress toward compliance, and examination of supporting documentation; and

iv. Shall provide recommendations for each of the provisions in the Agreement outlining proposed actions for at least the next six months for ADOC and Tutwiler to complete

toward achieving compliance with the particular provision.

4. These Reports will be filed with the Court and shall be written with due regard for the privacy interests of individuals.

5. Nothing in this Section prohibits the Monitor from issuing interim letters or reports to DOJ, ADOC, and Alabama or the Court via the public record in this case should s/he deem it necessary.

D. Limitations

1. Except as required or authorized by or necessary to evaluate the terms of this Agreement, or as directed by the court, or as authorized by ADOC, Tutwiler, and DOJ acting together, the Monitor shall not make any public statements (at a press conference or otherwise) with regard to any act or omission of ADOC or Tutwiler or their agents, representatives or employees, or disclose

information provided to the Monitor pursuant to this Agreement.

2. The Monitor shall not testify in any other litigation or proceeding with regard to any act or omission of ADOC or Tutwiler or any of their agents, representatives, or employees related to this Agreement, nor testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement, nor serve as a non-testifying expert regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement.

3. Unless such conflict is waived by ADOC, Tutwiler, and DOJ, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such

litigant's or claimant's attorney, in connection with a claim or suit against ADOC or Tutwiler, their departments, officers, agents or employees.

4. The Monitor is not a State/County or local agency or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records subject to public inspection.

5. Neither the Monitor nor any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Agreement shall be liable for any claim, lawsuit or demand arising out of the Monitor's performance pursuant to this Agreement.

E. The Monitor shall provide ADOC and Tutwiler with technical assistance as requested. Technical assistance should be reasonable and should not interfere with the Monitor's ability to assess compliance.

F. The Monitor may convene regular monthly conference calls with the DOJ, ADOC, and Alabama to discuss

implementation of the terms of the Agreement, updates, and any other items that the Monitor and/or DOJ, ADOC, and Alabama wish to discuss.

G. ADOC and Tutwiler representatives and staff shall not retaliate against any person because that person has provided information or assistance to the Monitor or DOJ relating to this Agreement.

H. DOJ, ADOC, and Alabama and the Monitor will treat all personally identifiable information obtained pursuant to this Agreement as confidential.

## IX. ENFORCEMENT

A. The United States District Court for the Middle District of Alabama will retain jurisdiction over this matter for the purposes of enforcing this Agreement.

B. During the period that this Agreement is in force, prior to initiating any enforcement proceedings in Court for an alleged failure to fulfill an obligation under this Agreement, the aggrieved party will notify

the other party in writing of the facts supporting the aggrieved party's belief that the other party is not in compliance. The responding party will investigate the allegations and respond in writing within 30 days. If the aggrieved party is not satisfied with the other party's response, DOJ, ADOC, and Alabama will conduct negotiations to resolve the issue(s). If DOJ, ADOC, and Alabama are unable to resolve the issue(s) satisfactorily within 30 days of the other party's written response, the aggrieved party may move the Court for any relief permitted by law or equity.

## X. CONSTRUCTION AND TERMINATION

A. If any unforeseen circumstance occurs that causes a failure to timely carry out any requirements of this Agreement, ADOC and Tutwiler shall notify DOJ in writing within 30 days (or as soon as reasonably practicable) after ADOC and Tutwiler become aware of the unforeseen circumstance and its impact on ADOC's

and Tutwiler's ability to perform under the Agreement. The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. ADOC and Tutwiler shall implement all reasonable measures to avoid or minimize any such failure.

B. This Agreement shall terminate when ADOC and Tutwiler have achieved substantial compliance with all of the substantive provisions of this Agreement in three consecutive Compliance Reports.

C. The burden will be on ADOC and Tutwiler to demonstrate that they have maintained substantial compliance with each of the provisions of this Agreement. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure by ADOC and Tutwiler to maintain substantial compliance. At the same time, temporary compliance during a period of sustained non-compliance will not constitute substantial compliance.

D. The  burden  shall  be  on  ADOC  and  Tutwiler  to
   demonstrate  they  have  achieved  substantial  compliance
   with a particular section of this Agreement.


## XII. STIPULATION PURSUANT TO THE PRISON
## LITIGATIONREFORM ACT, 18 U.S.C. § 3626

DOJ,  ADOC,  and  Alabama  stipulate  and  agree  that
this  Agreement  complies  in  all  respects  with  the
requirements  for  prospective  relief  under  the  Prison
Litigation Reform Act, 18 U.S.C. § 3626 (a).

DOJ, ADOC, and Alabama stipulate and agree that all of
the  prospective  relief  in  this  Agreement  is  narrowly
tailored, extends no further than would be necessary to
correct  the  violations  of  federal  rights  as  set  forth
by  the  United  States  in  its  Complaint  and  Findings
Letter,  is  the  least  intrusive  means  necessary  to
correct these violations, and will not have an adverse
impact on public safety or the operation of a criminal
justice system. Any admission made for the purposes of

this Agreement is not admissible if presented by third

parties in another proceeding.

DONE, this the 18th day of June, 2015.

    /s/ Myron H. Thompson    
UNITED STATES DISTRICT JUDGE