IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:15-cv-00368-MHT-CWB |
| ) | |
| STATE OF ALABAMA AND ALABAMA DEPARTMENT OF CORRECTIONS, ) | |
| ) | |
| Defendants. ) | |

**INTERNAL MONITOR'S REPORT
IN RESPONSE TO COURT'S ORDER**

Defendants the State of Alabama and the Alabama Department of Corrections ("ADOC" and, together with the State of Alabama, the "State"), in conjunction with the Compliance Officer Deidra Wright ("Internal Monitor"), hereby respond to the three (3) questions raised by the Court's February 20, 2024 Order (Doc. No. 127), and state as follows:

I. **WHAT WERE THE "DISCREPANCIES" AND "EXTENDED TIMEFRAME" ALLUDED TO IN THE SIXTEENTH COMPLIANCE REPORT'S DISCUSSION OF PREA INVESTIGATIONS?**

As part of the review for the Sixteenth Compliance Report (Doc. No. 118-1, "Compliance Report"), the Internal Monitor reviewed all twenty-eight (28) PREA related investigations during the reporting period. The investigations included

eleven (11) inmate-on-inmate sexual abuse ("IOI SA") allegations, two (2) inmate-on-inmate sexual harassment ("IOI SH") allegations, twelve (12) staff-on-inmate sexual abuse ("SOI SA") allegations, and three (3) staff-on-inmate sexual harassment ("SOI SH") allegations.  These investigations included the following:

| IOI SA | Case No. | Disposition |
|---|---|---|
|  | 23-0010 | Substantiated |
|  | 23-0022 | Unfounded |
|  | 23-0030 | Substantiated |
|  | 23-0050 | Unfounded |
|  | 23-0062 | Unfounded |
|  | 23-0115 | Unfounded |
|  | 23-0146 | Unsubstantiated |
|  | 23-0158 | Unsubstantiated |
|  | 23-0174 | Unsubstantiated |
|  | 23-0212 | Unfounded |
|  | 23-0956 | Unfounded |

| IOI SH | 23-0041 | Unsubstantiated |
|---|---|---|
|  | 23-0989 | Unfounded |

| SOI SH | 23-0013 | Unsubstantiated |
|---|---|---|
|  | 23-0108 | Unfounded |
|  | 23-0180 | Unfounded |
|  | 23-0202 | Unsubstantiated |
|  | 23-0244 | Unsubstantiated |
|  | 23-0341 | Unfounded |
|  | 23-0408 | Unfounded |
|  | 23-0413 | Unsubstantiated |
|  | 23-0629 | Unfounded |
|  | 23-0659 | Unfounded |

|        |         |                 |
|--------|---------|-----------------|
|        | 23-0773 | Unsubstantiated |
|        | 23-0954 | Unfounded       |
| **SOI SH** | 23-0036 | Unfounded       |
|        | 23-0170 | Unsubstantiated |
|        | 23-0955 | Unsubstantiated |

Of the twenty (28) total investigations, ADOC found fifteen (15) unfounded, eleven (11) unsubstantiated, and two (2) substantiated. Reviewing these investigations identified three (3) areas of concern, noted in the Compliance Report, regarding extended timeframes: twelve (12) cases included an extended timeframe of twenty (20) or more days for assigning a case to an investigator;[1] five (5) investigations exceeded the thirty (30) day time period for completing the Sexual Abuse Incident Review ("SAIR") by the SAIR Committee ("SAIRC");[2] and two (2) investigations resulted in an extended timeframe for completing the supervisor's review.[3] Upon review of the cases and the interviews with ADOC, LESD and OIG

---

[1] Case Nos. 23-001, 23-022, 23-0956, 23-0989, 23-0013, 23-0413, 23-0659, 23-0773, 23-0954, and 23-0955.  The delay in assigning cases also created concern with accessing video in six (6) cases (Case Nos. 23-0013, 23-0022, 23-0108, 23-0212, 23-0244, and 23-0955).

[2] The Sixteenth Monitor's Report Audit Tool reported ten (10) investigative files reviewed by the SAIRC outside of the thirty (30) day period.  Upon further review, the ten (10) included one (1) duplicate report and four (4) "unfounded" reports.  The Consent Decree requires the SAIRC to review only substantiated and unsubstantiated reports.  (Doc. No. 118-2 at 187).  The Case Nos. for the five (5) include: 23-0030, 23-0212, 23-0013, 23-0202, and 23-0170.

[3] Case Nos. 23-0244 and 23-0036.

3

staff, the concerns identified do not appear to have impacted the outcome of any of the cases.

Additionally, the Internal Monitor found discrepancies with one (1) PREA investigation substantiating an inmate-on-inmate sexual abuse allegation, and ten (10) PREA investigations concerning witness interviews.[4] With both issues, the Internal Monitor identified concerns regarding sufficient information included in the reports to confirm the analysis from the investigator as to why the investigator substantiated the inmate-on-inmate case, and/or the reasoning for interviewing or not interviewing certain witnesses in the ten (10) cases. In reviewing the ten (10) investigative reports, no evidence appeared to call into question the outcome of the investigations.

The Internal Monitor conducted interviews with investigators and OIG and LESD leadership regarding the identified discrepancies. Based on these interviews, and ADOC's decision to revert all PREA investigations back to LESD, the Internal Monitor concluded that ADOC identified the concerns with the investigations and took the necessary self-corrective action to resolve the concerns. The Internal Monitor will continue to monitor ADOC's investigations for compliance with the Consent Decree.

---

[4] The ten (10) cases concerning witnesses (23-0022, 23-0030, 23-0146, 23-0212, 23-013, 23-0108, 23-0180, 23-0629, 23-0773, and 23-0036) included the substantiated case (23-0030).

## II.   How Does the Internal Monitor Respond to Plaintiff's Concerns Regarding Tutwiler's Handling of PREA Investigations?

Plaintiff's responses to the Court's questions remain unfocused and vague. The Court ordered Plaintiff to respond to three (3) questions concerning PREA investigations. Specifically, Plaintiff responded to the following:

(a) What issues were identified in Tutwiler's investigation into PREA complaints?

(b) How common were those issues among the investigations reviewed?

(c) Why do the experts' concerns justify downgrading the State's compliance for each of the four relevant consent decree requirements form the compliance chart?

(Doc. No. 127 at 3-4). Plaintiff raised concerns with all eighteen (18) investigation reports their experts reviewed, and stated "concerns with the timeliness, completeness, and thoroughness of the investigations," notification to the complainants, starting investigations late, and failing to preserve evidence. (Doc. No. 131 at 2). Based on these concerns, Plaintiff argues the Court should reduce Consent Decree paragraphs III.K.2, III.K.5-8, III.K.12, and III.K.14-16 to partial compliance. The Consent Decree defines "Partial Compliance" as "ADOC and Tutwiler have achieved material compliance on some of the components of the relevant provision of the Agreement, but significant work remains." (Doc. No. 11

5

at 8). Plaintiff's response fails to indicate what, if any, work remains beyond transferring the investigative duties back to LESD. Further, Plaintiff fails to address the audit tool and how, if at all, Plaintiff's allegations result in an audit response that supports a finding of partial compliance.

To support its claims, Plaintiff cites to the declarations of purported experts Shelley Harrington (doc. no. 131-1 at ¶ 18) and Melinda Allen (doc. no. 131-3 at ¶¶ 4-10). Both declarations report concerns in vague generalities without explanation of which performance measures and audit tool sections Tutwiler appeared to fail. Ms. Harrington asserts allegations concerning the PREA investigations as follows:

- 8 investigations "involved incidents that occurred inside of the bathrooms";

- 11 investigations "failed to interview all potential witnesses";

- 8 investigations "experienced a delay that impacted the State's ability to properly preserve video evidence";

- 15 investigations "missed key opportunities for investigative follow-up that undermined the thoroughness of the investigation and its conclusions";

- 8 investigations "were not reviewed by the SAIR Team within 30 days of completion";

- 18 investigations "failed to make required credibility determinations on the evidence"; and

- No documentation existed concerning monitoring retaliation against complainant and others involved

6

in the 18 investigations. (Doc. 131-1 at ¶ 18). Ms. Harrington failed to identify which, if any, sections of the Audit Tool (doc. no. 118-2) or the Consent Decree these alleged "concerns" violate. Ms. Allen cited similar general concerns, alleging:

- 5 investigations "indicated some form of credibility assessment," but not sufficient for PREA standards;[5]

- 11 investigations lacked documentation that inmates received notice of reassignments of staff pending the outcome of the PREA investigation;

- 12 investigations "were initiated late, which undermined the promptness and thoroughness of the investigation;

- 8 investigations "show that the SAIRs were completed late";

- 9 investigations contained notifications to inmates concerning the outcome of their complaints that "were written and dated before the investigation was even completed";

- 5 investigations required "an administrative investigation be completed in addition to the

---

[5] Ms. Allen suggests the "PREA Resource Center (2023)" requires an investigator to "assess, among other things, why they do or do not trust the person, evidence, and information, what supporting evidence there is, or how the evidence supports the findings." (Doc. No. 131-3 at ¶ 4). Neither Ms. Allen, nor Plaintiff, cite to the alleged PREA standard requiring the information listed by Ms. Allen. PREA Standard §115.71 (e) requires "[t]he credibility of an alleged victim, suspect, or witness shall be assessed on an individual basis and shall not be determined by the person's status as inmate or staff." Further, subsection (f) requires investigators in administrative investigations to document, among other things, "the reasoning behind credibility assessments …." PREA Standard §115.71(f)(2). Neither the purported experts nor Plaintiff allege the investigators failed to investigate or determined the outcome of an investigation based on a bias concerning the status of the victim as an inmate or alleged suspect as staff.

7

> criminal investigation, but the administrative investigations were not completed"; and
>
> - No documentation existed concerning monitoring retaliation against complainants and others involved in the 18 investigations.

(Doc. No. 131-3 at ¶¶ 4-10). In addition to these concerns, Ms. Allen included specific concerns with four (4) investigations (23-0413, 23-0244, 23-0010, and 23-0030). As with Ms. Harrington's response, Ms. Allen failed to identify which, if any, sections of the Audit Tool (doc. no. 118-2) or the Consent Decree these alleged "concerns" violate.

As stated above, the Internal Monitor reviewed twenty-eight (28) investigative reports and noted issues related to these reports. The Internal Monitor met with ADOC, LESD and OIG personnel and leadership concerning these issues. Based upon these concerns, ADOC conducted self-corrective action and transferred all PREA investigations back to LESD. This corrective action addressed the identified concerns and supported the finding that ADOC remains in substantial compliance with these provisions. As defined in the Consent Decree, partial compliance "indicates that ADOC and Tutwiler have achieved material compliance on some components of the relevant provision of the Agreement, but significant work remains." (Doc. No. 11, II.B.). ADOC's corrective action addresses the concerns identified by the Internal Monitor, and, as such, no "significant work remains."

### III. HOW DOES SHE RESPOND TO THE DOJ'S CONCERNS REGARDING WHETHER THE STAFFING ANALYSIS IS GENDER-RESPONSIVE AND OTHERWISE TAILORED TO TUTWILER'S NEEDS?

Questions four (4), five (5), and six (6) relate to the staffing analysis of Tutwiler. (Doc. No. 127 at 4). Throughout the Report, Plaintiff relies on Ms. Harrington to make claims regarding the alleged inadequateness of the 2022 Staffing Analysis. A review of Ms. Harrington's curriculum vitae (see Doc. No. 131, Ex. A-1) reveals neither education history nor employment history qualifying her to make these assertions. Plaintiff's claims, in reliance on her opinion, indicate the "State's current staffing analysis, corresponding staffing plan, and Tutwiler relief factor may not accurately reflect Tutwiler's daily operational needs and the staffing required to operate Tutwiler safely," (Doc. No. 131 at 9), fail to analyze how "overtime use affects the relief factor calculation as it may reveal whether the staffing for a particular post truly reflects the post's workload and what really happens day-to-day in that area," (Doc. No. 131 at 9-10), and lack an analysis of "how the Tutwiler relief factor considers gender responsive staffing requirements and other unique characteristics of the facility." (Doc. No. 131 at 10). Considering Ms. Harrington's lack of qualifications to make such assertions and Plaintiff's lack of additional support for these assertions, Plaintiff's Report lacks any merit.

ADOC conducted and completed the 2022 Staffing Analysis utilizing the Resource Planning Unit ("RPU"), under the assistance and guidance of highly

9

qualified correctional staffing experts, Russ and Meg Savage. The 2022 Staffing Analysis specifically discusses the gender-responsive training required by all security staff members assigned to Tutwiler. (2022 Staffing Analysis at p. 6).[6] Further, the Staffing Analysis describes the factors considered by the RPU in completing the Staffing Analysis as it concerns Tutwiler. These factors included:

1. Generally accepted detention and correctional practices;

2. ADOC and Tutwiler's determination of which necessary duties will be handled by Tutwiler staff, ADOC staff, or outside agencies;

3. Any findings of inadequacy from any investigative agencies within ADOC;

4. Any findings of inadequacy from internal or external oversight bodies;

5. The camera management plan and all components of the facility's physical plant;

6. The composition of the inmate population;

7. The number and placement of supervisory staff;

8. The institutional programming and options for supervision of inmates;

9. A Tutwiler specific shift relief factor;

10. Any applicable state or local laws, regulations, or

---

[6] The State provided the Tutwiler specific sections of the 2022 Staffing Analysis and Facilities Shift Relief Requirements for the Alabama Department of Corrections to Plaintiff. The State provided this document under the Protective Order and the document remains "Highly Confidential." The State will provide a copy of the document to the Court under seal if necessary to assist the Court's analysis.

      standards; and

    11.    The prevalence of substantiated and unsubstantiated incidents of sexual abuse and sexual harassment.

(Id. at p. 48). Based upon the extensive review conducted by the RPU, under the guidance and training of correctional staffing experts, ADOC's Staffing Analysis remains a thoroughly reviewed and reliable document.[7]

Plaintiff requests additional factors to be considered in the 2022 Staffing Analysis, including the use of overtime and specific review of certain incidents, including inmates moving between housing units and incidents occurring in the bathroom areas. (Doc. No. 131 at 9). In accordance with Administrative Regulation 238, the RPU will conduct a new staffing analysis during 2024. Plaintiff recently interviewed the director of the RPU, and ADOC will provide Plaintiff with additional documents as the RPU conducts and completes the 2024 staffing analysis for Tutwiler.

## IV.   CONCLUSION.

The Internal Monitor conducted a thorough review of Tutwiler during the reporting period of January 1, 2023 through June 30, 2023. The review included site visits, document review, staff interviews and inmate interviews. Based on the extensive experience of the Internal Monitor as a warden of a female correctional

---

[7] Plaintiff references the January 2023 "Julia Tutwiler Prison for Women's Staffing Status Report." (Doc. No. 131 at 8). This document concerns specific gender responsive posts and does not equate to the total number of staff required to fill these posts.

11

facility, the Internal Monitor found ADOC remained in substantial compliance, as it had previously remained for several years.  The Internal Monitor will continue to work with Plaintiff to ensure a complete and honest evaluation of the operations at Tutwiler, as these operations concern compliance with the Consent Decree.

Respectfully submitted this 1st day of April, 2024.

*/s/ Kenneth S. Steely*

*One of the Attorneys for the State*

William R. Lunsford
Matthew B. Reeves
Kenneth S. Steely
**BUTLER SNOW LLP**
200 West Side Square
Suite 100
Huntsville, Alabama 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
matt.reeves@butlersnow.com
kenneth.steely@butlersnow.com

## CERTIFICATE OF SERVICE

  I hereby certify that a copy of the foregoing has been served upon all parties in this matter, including without limitation the following, by the Court's CM/ECF system on this the 1st day of April, 2024:

James Joseph DuBois
**U.S. ATTORNEY'S OFFICE**
PO Box 197
Montgomery, AL 36101
Telephone: (334) 223-7280
Facsimile: (334) 223-7418

Maura M. Klugman
**U.S. DEPARTMENT OF JUSTICE**
**CIVIL RIGHTS DIVISION,**
**SPECIAL LITIGATION UNIT**
150 M Street NE
Washington, DC 20001
Telephone: (202) 305-0053
maura.klugman@usdoj.gov

Marylou E. Bowdre
**UNITED STATES ATTORNEY'S OFFICE**
**MIDDLE DISTRICT OF ALABAMA**
131 Clayton Street
Montgomery, AL 36104
Telephone: (334) 223-7280
Facsimile: (334) 223-7560
marylou.bowdre@usdoj.gov

Ariona Renee Jean-Johnson
**U.S. DEPARTMENT OF JUSTICE**
**CIVIL RIGHTS DIVISION**
950 Pennsylvania Ave., NW
Washington, DC 20530
Telephone: (202) 532-3838
ariona.jean-johnson@usdoj.gov

Christopher N. Cheng
**U.S. DEPARTMENT OF JUSTICE**
**CIVIL RIGHTS DIVISION**
4 Constitution Square
150 M. Street N.E. – Room 10.1128
Washington, DC 20530
Telephone: (202) 514-8892
christopher.cheng@usdoj.gov

*Attorneys for Plaintiff*

        */s/ Kenneth Steely*
        *Of Counsel*