**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:15-cv-00368-MHT** |
| | ) | |
| **STATE OF ALABAMA AND** | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **CORRECTIONS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THE STATE'S MEMORANDUM OF LAW IN
<u>SUPPORT OF MOTION TO TERMINATE THE CONSENT DECREE</u>**

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND .............................................2

ARGUMENT ...................................................................................................6

I. THE PLRA REQUIRES THE TERMINATION OF ALL REMAINING
PROVISIONS OF THE CONSENT DECREE .............................................7

   A. Plaintiff Must Prove That the Remaining Provisions Are Necessary to
Correct A "Current and Ongoing" Constitutional Violation, Extend No
Further than Necessary to Correct the Violation, and Represent The Least
Intrusive Means to Correct the Violation ......................................................8

   B. Plaintiff Cannot Demonstrate That A "Current and Ongoing" Constitutional
Violation Exists As To Staffing Or PREA At Tutwiler. ............................11

   C. The Remaining Provisions of the Consent Decree Currently Fail The
PLRA's "Needs-Narrow-Intrusiveness" Mandate......................................15

II. THE STATE SATISFIED THE REMAINING PROVISIONS OF THE
CONSENT DECREE ..........................................................................19

   A. The State's Sustained Substantial Compliance with the Remaining
Provisions Regarding Staffing ................................................................20

      i. The State's Compliance with Section III.C.1. – Phase 1 Staffing
Measures: Recruitment, Training, and Prison Rape Elimination Act
("PREA") Leadership Roles...............................................................20

      ii. The State's Compliance with Section III.C.2. – Phase 2 Staffing
Measures: Staffing Analysis, Staffing Plan, and Reporting .................25

   B. The State's Sustained Substantial Compliance with the Remaining
Provisions Regarding Investigations.........................................................31

    i.    The State's Compliance with Section III.K.2. – Prompt, Thorough, and Objective Investigations ...........................................................32

    ii.    The State's Compliance with Section III.K.5.-7. – Specialized Training for Investigators, Evidence Collection and Preservation, and Individualized Credibility Assessments ...............................................33

    iii.    The State's Compliance with Section III.K.8.-9., 12., 14.-15. – Timely Written Investigative Reports, Investigative Summary Sheets and Documentation, Written Notice to Inmates of Investigative Outcomes, and Notice to Inmates of Staff Perpetrator Status Changes .................35

    iv.    The State's Compliance with Section III.K.16. – Sexual Abuse Incident Review Committee ............................................................................38

  C.  The State's Sustained Substantial Compliance with the Remaining Provisions – Compliance Chart....................................................39

CONCLUSION ....................................................................................41

CERTIFICATE OF SERVICE ...............................................................44

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

Balla v. Idaho State Bd. of Corr.
  No. 1:81-CV-1165-BLW, 2020 WL 2812564 (D. Idaho May 30, 2020) ............. 15

Benjamin v. Jacobson
  172 F.3d 144 (2d Cir. 1999) ...................................................................................... 9

Brown v. Plata
  563 U.S. 493 (2011) .................................................................................................. 8

Cason v. Seckinger
  231 F.3d 777 (11th Cir. 2000) ........................................................................... Passim

Farmer v. Brennan
  511 U.S. 825 (1994) ................................................................................................. 11

Gilmore v. State of Cal.
  220 F.3d 987 (9th Cir. 2000) .................................................................................. 10

Guajardo v. Tex. Dep't of Crim. Just.
  363 F.3d 392 (5th Cir. 2004) .................................................................................... 9

Hoffer v. Sec'y, Fla. Dep't of Corr.
  973 F.3d 1263 (11th Cir. 2020) .............................................................................. 16

Howe v. Hughes
  74 F.4th 849 (7th Cir. 2023) ................................................................................... 16

Laaman v. Warden, N.H. State Prison
  238 F.3d 14 (1st Cir. 2001) ...................................................................................... 9

Pierce v. Cnty. Of Orange
  526 F.3d 1190 (9th Cir. 2008) ................................................................................ 10

Rasho v. Jeffreys
  22 F.4th 703 (7th Cir. 2022) ............................................................................. 16, 17

Robinson v. Delgado
   No. CV 02-1538 NJV, 2010 WL 3448558 (N.D. Cal. Aug. 31, 2010) ................ 16

Wade v. McDade
   106 F.4th 1251 (11th Cir. 2024) ....................................................................... 12

## **Statutes**

18 U.S.C. § 3626(b) ........................................................................................... 9

18 U.S.C. § 3626(b)(1)(A)(i) ......................................................................... 1, 7, 41

18 U.S.C. § 3626(b)(3)............................................................................. 6, 7, 8, 9

18 U.S.C. § 3626(g)(7)........................................................................................ 7

42 U.S.C. § 1997................................................................................................ 2

U.S. Const. amend VIII......................................................................................11

The State of Alabama and the Alabama Department of Corrections ("ADOC" and, together with the State of Alabama, the "State") hereby submit, pursuant to the Prison Litigation Reform Act, 18 U.S.C. § 3626(b)(1)(A)(i) (the "PLRA") and the terms of the Consent Decree (doc. 11, the "Consent Decree") regarding Julia Tutwiler Prison for Women ("Tutwiler"), this Memorandum of Law in support of the State's Motion to Terminate the remaining provisions of the Consent Decree (the "Motion"). The State hereby moves for the termination of all reaming provisions of the Consent Decree including the following: Staffing Provisions (Sections III.C.1-2.) and Prison Rape Elimination Act ("PREA") Investigations (Sections III.K.2., III.K.5.-9., III.K.12., and III.K.14.-16.) (collectively, the "Remaining Provisions"). In support of this Motion, the State submits the following:

## INTRODUCTION

For the past ten years, the State and Tutwiler staff invested time, energy and countless resources to achieve "the goal of ensuring that inmates at the Julia Tutwiler Prison for Women are provided with constitutional conditions that protect them from sexual abuse and sexual harassment." (Doc. 11 at 1-2). Based on the hard work documented through multiple monitoring reports, the State and Tutwiler staff accomplished this mission. Years ago, the State initiated the implementation of a robust set of institutionalized systems that advanced the Consent Decree's objectives and demonstrated its performance more than the minimum constitutional

requirements.  As detailed below, the Internal Monitor's last four Compliance Reports document compelling evidence of the State's exceptional performance. Indeed, even Plaintiff the United States of America ("Plaintiff") agrees that the State complied with most of the Consent Decree, holding on to a small number of provisions in the face of repeated evidence of compliance.  The State respectfully requests that the Court terminate the Remaining Provisions of the Consent Decree and all activities pertaining to the related court oversight of and monitoring of Tutwiler for at least the following two reasons:

1.    The PLRA requires the termination of the Remaining Provisions of the Consent Decree; and

2.    The State satisfied the Remaining Provisions of the Consent Decree.

For these reasons, the State requests that the Court terminate the Remaining Provisions of the Consent Decree.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 17, 2014, Plaintiff issued a notice of findings letter regarding its investigation under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, contending the State violated the constitutional rights of inmates incarcerated at Tutwiler by failing to protect them from sexual abuse and sexual harassment from correctional staff.  (Doc. 1 at 2-4, ¶¶ 11-25).  On May 28, 2015, Plaintiff filed a Complaint against the State pursuant to CRIPA, alleging that the State violated the constitutional rights of inmates incarcerated at Tutwiler.  (Doc. 1).

2

The same day, the Parties filed a Joint Motion to Enter Settlement Agreement, attaching a signed Settlement Agreement and asking the Court to enter the Settlement Agreement as a Court order. (Docs. 2, 2-1). On June 18, 2015, the Court adopted the Parties' Settlement Agreement (Docs. 10, 12) and entered its terms as a Consent Decree. (Doc. 11). For over a decade, the State implemented policies and processes aligned with the Consent Decree and worked to achieve substantial compliance with the Consent Decree.

The Consent Decree provided for a Monitor "to assess and report whether the provisions of this Agreement have been implemented, and whether this implementation is resulting in a reduction of incidents of sexual abuse and sexual harassment and professional treatment of inmates." (Doc. 148-1 at 114). The Consent Decree instructed the Monitor to "conduct a baseline visit" and "design a monitoring plan." (Doc. 148-1 at 117). The Monitor then "issue[d] a Compliance Report six months after the baseline visit, and then every six months thereafter." (Id.). Each Compliance Report "evaluate[d] the status of compliance for each relevant provision of the Agreement using the following standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-compliance." (Id. at 118). The Consent Decree provides that it "shall terminate when ADOC and Tutwiler have achieved substantial compliance with all of the substantive provisions of this Agreement in three consecutive Compliance Reports." (Doc. 148-1 at 125).

Furthermore, "[n]on-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure by ADOC and Tutwiler to maintain substantial compliance." (Id.).

Pursuant to the terms of the Consent Decree, an external monitor (the "External Monitor") initially oversaw the State's compliance with the provisions of the Consent Decree. (Id. at § VII(A)(1)). The Consent Decree instructed the External Monitor to issue a Compliance Report every six months ("Monitoring Period"), determining for each relevant provision the extent of the State's compliance with the Consent Decree. The most recent External Monitor, Dr. Kathleen Dennehy, resigned following the submission of the Fifteenth Compliance Report (Doc. 101-1) on April 21, 2023. Following Dr. Dennehy's resignation, the State, with Plaintiff's agreement, transitioned to an internal monitoring process on October 27, 2023. (Doc. 113 at 4-5). The State then appointed an internal monitor, Ms. Diedra Wright, (the "Internal Monitor"), to oversee the State's performance. (Id.).

Over the course of nearly a decade, the State implemented extensive reforms and achieved sustained compliance with each the Consent Decree's provisions. (See Docs. 145, 161, 177, 200-1). On September 26, 2024, the Parties jointly requested that the Court terminate Sections III.A., III.B., III.D., III.E., III.F., III.G., III.H., III.I., III.J., III.K.1., III.K.3.-4., III.K.10.-11., III.K.13., III.K.17.-18., III.L., III.M.,

4

and IV of the Consent Decree.  (Doc. 148).  On October 4, 2024, the Court terminated those portions of the Consent Decree, immediately terminating "all monitoring activities with respect to the terminated sections."  (Doc. 152 (the "Partial Termination Order") at 2).  After the Partial Termination Order, only two areas of the Consent Decree remained: staffing (Sections III.C.1. and III.C.2.) and investigations of sexual abuse and sexual harassment allegations (Sections III.K.2., III.K.5.-9., III.K.12., and III.K.14.-16.).  (Docs. 148-1, 152).  Beginning with the Second Compliance Report, dated August 25, 2026, and continuing through the Twentieth Compliance Report, dated February 19, 2026, the External and Internal Monitors confirmed the State's substantial compliance with all investigation provisions.  (see Chart 2, infra 40-41).  The Internal Monitor confirmed the State's substantial compliance with the staffing provisions starting with the Seventeenth Compliance Report, dated September 12, 2024, and continuing through the Twentieth Compliance Report, dated February 19, 2026.  (See Chart 1, infra 40). Plaintiff filed notices disagreeing with the Internal Monitor's findings[1] (see docs. 202 at 9; 179 at 8; 163 at 3; 147 at 4), but conceded the State "improved in several

---

[1] However, even if Plaintiff disagreed with the Internal Monitor's findings, Plaintiff did not follow the procedure set out in Section IX.B. of the Consent Decree for notification of a disagreement.  (See Doc. 148-1 at 123-24) ("[P]rior to initiating any enforcement proceedings in Court for an alleged failure to fulfill an obligation under this Agreement, the aggrieved party will notify the other party in writing of the facts supporting the aggrieved party's belief that the other party is not in compliance.").

areas, warranting substantial compliance for several Consent Decree provisions concerning staffing (C.1.ii-v, C.2.viii-x) and investigations (K.1, 5, 7, 9, 12, 14-15)."[2] (Doc. 202 at 1). Based on the Parties' disagreements, the Court referred the Parties to mediation with Judge John Ott on March 9, 2026, to assist the Parties in resolving the Remaining Provisions of the Consent Decree. (Doc. 201). As set forth below, the State moves to terminate the Remaining Provisions of the Consent Decree, as the State achieved sustained substantial compliance with all Remaining Provisions.

**ARGUMENT**

The facts below confirm the absence of any "current and ongoing" constitutional violation as it relates to the Remaining Provisions, thereby warranting immediate termination of these provisions. 18 U.S.C. § 3626(b)(3). Additionally, the facts demonstrate the State's significant and ongoing efforts to create policies and procedures that far exceed any constitutional mandate, as well as compliance with both the letter and spirit of the Remaining Provisions of the Consent Decree. Accordingly, all Remaining Provisions are ripe for termination, and the State respectfully requests that the Court grant this Motion and terminate them consistent with both the terms of the Consent Decree and the PLRA.

---

[2] While Plaintiff admitted substantial compliance for these sections, Plaintiff continues to allege the State has not substantially complied with C, C.2.i-viii and K.2, 6, and 8. (Doc. 202 at 1).

6

## I.   THE PLRA REQUIRES THE TERMINATION OF ALL REMAINING PROVISIONS OF THE CONSENT DECREE.

The PLRA controls whether prospective relief in prison-conditions cases should continue into the future.  18 U.S.C. § 3626(b)(3).  This statutory mandate places "limits on the scope of prospective relief that a court has the authority to enter" and, just as importantly here, "limits a court's authority to continue to enforce previously entered prospective relief" in prison-conditions litigation.  Cason v. Seckinger, 231 F.3d 777, 780 (11th Cir. 2000).  As set forth below, the PLRA provides the prevailing legal basis for the termination of the Remaining Provisions of the Consent Decree.

On its face, the PLRA mandates the circumstances warranting termination of prospective relief, defined as "all relief other than compensatory monetary damages[.]" 18 U.S.C. § 3626(g)(7).  No serious debate exists that the Consent Decree's Remaining Provisions qualify as "prospective relief." Id.; Cason, 231 F.3d at 781 (treating consent decrees as prospective relief subject to PLRA's termination provisions).  Under 18 U.S.C. § 3626(b)(1)(A)(i), "[i]n any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener … 2 years after the date the court granted or approved the prospective relief[.]" As the Court entered the Consent Decree on June 18, 2015, more than a decade has now passed, thereby authorizing this Motion to Terminate.  (Doc. 11).

7

Once a party moves for termination of prospective relief under the PLRA, continued enforcement is better characterized as the exception, not the rule. See Brown v. Plata, 563 U.S. 493, 515 (2011) (noting the "the PLRA entitles a State to terminate remedial orders such as these after two years unless the district court finds that the relief 'remains necessary to correct a current and ongoing violation of the Federal right.'") (quoting (quoting 18 U.S.C. § 3626(b)(3)).  As such, the PLRA contains stringent requirements for continuation of prospective relief:

> Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a **current and ongoing** violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3) (emphasis added).  So, the key question presented here revolves around the question of whether Plaintiff can carry its burden to demonstrate the existence of current and on-going constitutional violations coupled with the necessity of continuing prospective relief.

    **A.**    **Plaintiff Must Prove That the Remaining Provisions Are Necessary to Correct A "Current and Ongoing" Constitutional Violation, Extend No Further than Necessary to Correct the Violation, and Represent The Least Intrusive Means to Correct the Violation.**

Plaintiff must demonstrate the existence of a "current and ongoing" constitutional violation justifying the continuation of the Remaining Provisions of

the Consent Decree.  18 U.S.C. § 3626(b)(3).  The Fifth Circuit set out the applicable burden-shifting framework that applies to a motion to terminate under 18 U.S.C. § 3626(b): the State, "in seeking termination, must initially establish the requisite passage of time…. As held by most courts, the burden of proof then shifts to the prisoners to demonstrate ongoing violations and that the relief is narrowly drawn." Guajardo v. Tex. Dep't of Crim. Just., 363 F.3d 392, 395 (5th Cir. 2004).  The Eleventh Circuit applied this same standard in Cason, holding that the district court erred by refusing to grant plaintiffs an evidentiary hearing on a motion to terminate, as "the plaintiffs were not afforded an opportunity to prove that there are 'current and ongoing' violations of class members' federal rights."  231 F.3d at 783; see also Laaman v. Warden, N.H. State Prison, 238 F.3d 14, 20 (1st Cir. 2001) (holding that "the burden remains on the plaintiffs to show that such violations [of federal rights] persist"); Benjamin v. Jacobson, 172 F.3d 144, 166 (2d Cir. 1999) (holding that district court "must allow the plaintiffs an opportunity to show current and ongoing violations of their federal rights").  Thus, to avoid termination under the PLRA, Plaintiff must demonstrate that a current and ongoing constitutional violation justifies the continuation of the Remaining Provisions.

The Eleventh Circuit held that the PLRA's legislative history "clearly shows that Congress intended 'current and ongoing' to mean a presently existing violation, not a potential, or even likely, future violation."  Cason, 231 F.3d at 783; see also

9

Pierce v. Cnty. Of Orange, 526 F.3d 1190, 1205 (9th Cir. 2008) (PLRA's termination "standard requires an assessment of the circumstances – both legal and factual – at the time termination is sought"); Gilmore v. State of Cal., 220 F.3d 987, 1010 (9th Cir. 2000) (holding that "'the record referred to [in § 3626(b)(3)] cannot mean the prior record but must mean a record reflecting conditions as of the time termination is sought'") (quoting Benjamin, 172 F.3d at 166) (alteration in original) (some internal quotation marks omitted).  Thus, a "current and ongoing" violation means a violation that exists now, not a past or future violation.

The Court in Cason further held, "if there is a 'current and ongoing' violation, the question becomes whether the prospective relief meets the need-narrowness-intrusiveness requirements at the time of the court's inquiry in response to the motion to terminate." 231 F.3d at 784.  In other words, "[t]he court must make new findings about whether the relief *currently* complies with the need-narrowness-intrusiveness requirements, given the nature of the *current* violations."  Id.   Furthermore, the Court may not "summarily conclud[e] that all of the [Remaining Provisions] satisfy all of the requirements of § 3626(b)(3)."  Id. at 785.  Instead, the Court:

> should engage in a specific, provision-by-provision examination of the [Remaining Provisions], measuring each requirement against the statutory criteria.  The [C]ourt must determine, and enter findings about, whether each requirement extends no further than necessary to correct a current and ongoing violation of a federal right, is narrowly drawn, and is the least intrusive means of correcting that violation.  Only if the [C]ourt makes

10

> written findings on the record that the relief satisfies the above need-narrowness-intrusiveness standards can the prospective relief be continued

Id. As set forth below, Plaintiff cannot carry this burden, and the Court should terminate the Remaining Provisions.

### B. Plaintiff Cannot Demonstrate That A "Current and Ongoing" Constitutional Violation Exists As To Staffing Or PREA At Tutwiler.

The Eighth Amendment forbids the infliction of "cruel and unusual" punishments. U.S. Const. amend VIII. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). The Eleventh Circuit recently clarified this "deliberate indifference" standard:

> 1. *First*, of course, the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, "objectively, 'sufficiently serious.'"
>
> 2. *Second*, the plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law," and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff–with the caveat, again, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and

Unusual Punishments Clause" if he "responded reasonably to the risk."

Wade v. McDade, 106 F.4th 1251, 1262 (11th Cir. 2024) (*en banc*) (quoting Farmer, 511 U.S. 834, 839, 844-45) (internal citations omitted).  Plaintiff must demonstrate that the defendant "was subjectively aware that his own conduct–again, his own actions or inactions–put the plaintiff at substantial risk of serious harm."  Id. at 1258. Thus, in accordance with the Eighth Amendment, Plaintiff must demonstrate that the State's actions or inactions related to staffing and PREA referrals and investigations currently rise to the level of subjective recklessness as used in criminal law.

Plaintiff cannot carry its burden to demonstrate the existence of a current and ongoing constitutional violation as to staffing at Tutwiler. The Twentieth Compliance Report submitted by the Internal Monitor on February 19, 2026, demonstrates the absence of deliberate indifference as to correctional staffing at Tutwiler.  The Internal Monitor stated, "it remains important to note significant improvements made by ADOC regarding Tutwiler's staffing levels and the efforts taken by ADOC and Tutwiler staff related to the recruitment and retention of officers." (Doc. 200-1 at 32).  Effective September 1, 2025, Commissioner John Hamm authorized the transfer of eleven correctional staff from Kilby to Tutwiler to work a six-month rotation with the option to extend that rotation. (Id. at 17).  Since June 2023, Tutwiler's officer vacancy rate continuously declined from 58% to 35.2% as of October 2025.  (Id. at 32).  The Internal Monitor noted that the decline in

12

vacancy rate to 35.2% is "an improvement attributable to deliberate and repeatable strategies rather than temporary or chance fluctuations." (Doc. 200-1 at 57-58). The Internal Monitor further stated, "ADOC's increased staffing levels reflect a sustained, institutionalized recruitment and retention framework, driven by concrete, repeatable policies and practices ADOC implemented and continues to execute." (Doc. 200-1 at 47). Additionally, the State implemented the eleven factors pursuant to Section III.C.2.ii in order to calculate adequate staffing levels. (see infra at 24-25). To be clear, nothing in the Consent Decree requires the State to achieve the impossible task of eliminating all vacancies among the correctional staff at Tutwiler. Plaintiff's own prison system – the largest prison system in the world – utilizes a tortured calculation of correctional staffing levels that inaccurately inflates its overall staffing levels. However, even using this tortured measurement of correctional staffing levels, Plaintiff's own prison system claims a nationwide vacancy rate of 24%. "Correctional Officer Staffing in Federal Prisons: Background and Issues," Congressional Research Service, Jan. 26, 2026, available at https://www.congress.gov/crs-product/R48826. Hence, unless Plaintiff believes that its own prison system suffers from unconstitutional levels of correctional staff, its own system demonstrates the chasm between vacancy rates among correctional staff and constitutional violations. Thus, Plaintiff cannot demonstrate that the State, or any ADOC official, acted with criminal recklessness with respect to correctional

staffing.  To the contrary, the evidence reflects that the State continues to engage in extensive efforts to improve correctional staffing at Tutwiler.

Plaintiff cannot demonstrate the existence of a current and ongoing constitutional violation justifying the continuation of the Agreement as it pertains to PREA referrals and investigations.  Again, evidence presented in the Twentieth Compliance Report confirms the State's lack of deliberate indifference concerning the PREA referrals and investigations process.  The Internal Monitor noted that "the Internal Monitor observed that the newly implemented Investigation Protocols resulted in more thorough and consistent narratives in the investigative reports dated after March 31, 2025."  (Doc. 200-1 at 60-61).  Additionally, the Internal Monitor noted that Director Bickhaus "reviews each investigative report herself to confirm the information within the investigative report."  (Doc. 200-1 at 60).  The Internal Monitor stated, "As evidenced by the investigative reports, investigators conduct comprehensive interviews, taking additional steps to identify and interview a broader range of witnesses, and document findings in a clear and structured manner."  (Doc. 200-1 at 61).  The State has also employed a PREA coordinator for nearly a decade.  (Infra at 23).  The Internal Monitor noted that "Director Vincent continues to provide consistent and comprehensive oversight of PREA implementation and compliance at Tutwiler."  (Doc. 200-1 at 25).

As set forth above, the Internal Monitor found the State in sustained substantial compliance with eleven out of eleven Remaining Provisions of the Consent Decree. (Supra at 5). The Internal Monitor's findings demonstrate not just the lack of subjective recklessness, but a concentrated effort by the State to take reasonable steps to address both correctional staffing and PREA referrals and investigation. Further, the notable lack of systemic adverse outcomes serves as confirmation that the State eliminated any constitutional violation in these areas. Plaintiff cannot establish a constitutional violation based upon isolated exceptions. Balla v. Idaho State Bd. of Corr., No. 1:81-CV-1165-BLW, 2020 WL 2812564, at *20 (D. Idaho May 30, 2020) (holding that "'proof of some individual failures does not establish systemic constitutional failures'"), aff'd sub nom. Balla v. Idaho, 29 F.4th 1019 (9th Cir. 2022) (quoting Graves v. Penzone, 2019 WL 4535543, at *3 (D. Ariz, Sept. 19, 2019)). Moreover, Tutwiler schedules SAIRC meetings once a month to provide organization and structure concerning when SAIRC reviews are scheduled and who must attend. (Doc. 200-1 at 69). The Internal Monitor therefore found "no significant work left to be done in relation to the timely completion of SAIRC reviews" and found Tutwiler in substantial compliance with Section III.K.16. (Id.).

**C.     The Remaining Provisions of the Consent Decree Currently Fail The PLRA's "Needs-Narrow-Intrusiveness" Mandate.**

15

Even if the Court finds that Plaintiff demonstrated the existence of a "current and ongoing" constitutional violation as to correctional staffing or PREA referrals and investigations at Tutwiler, Plaintiff still must demonstrate the propriety of "particularized findings, on a provision-by-provision basis," that each Remaining Provision complies with the PLRA. Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1278 (11th Cir. 2020) (quoting Cason, 231 F.3d at 785). Plaintiff must make this showing based on *current conditions*. Cason, 231 F.3d at 784-85. When determining whether prospective relief satisfies the PLRA's limitations, courts routinely hold that injunctions that include relief unnecessary to correct a constitutional violation run afoul of the PLRA. For example, the Seventh Circuit reversed an injunction where "the judge 'mistakenly conflated what is constitutionally *adequate* … with what is constitutionally *required*' and in doing so overstepped the bounds of the PLRA." Rasho v. Jeffreys, 22 F.4th 703, 713 (7th Cir. 2022) (quoting Westefer v. Neal, 682 F.3d 679, 683-84 (7th Cir. 2012)) (alteration in original). Notably, the PLRA prohibits relief that is "too prescriptive," because "federal courts must ensure that 'substantial discretion and flexibility' remain 'in the hands of the prison administrators.'" Howe v. Hughes, 74 F.4th 849, 857 (7th Cir. 2023) (quoting Westefer, 682 F.3d at 685); see also Robinson v. Delgado, No. CV 02-1538 NJV, 2010 WL 3448558, at *10 (N.D. Cal. Aug. 31, 2010) (observing that "a sufficiently narrow injunction … 'avoid[s] unnecessary disruption to the state

16

agency's normal course of proceeding'") (quoting Clement v. Cal. Dep't of Corr., 364 F.3d 1148, 1153 (9th Cir. 2004)) (citation and some internal quotation marks omitted). Finally, any "history of noncompliance" with a consent decree governing prison conditions does not "dilute the PLRA's remedial limitations. The PLRA applies of its own force and in full" in cases relating to prison conditions. Rasho, 22 F.4th at 713. Plaintiff cannot demonstrate that the Agreement's staffing provisions and PREA referrals and investigations provisions continue to pass muster under the PLRA.

For example, the provision to develop a staffing plan established in the Consent Decree at III.C.2. provides an unclear, open-ended standard that extends further than necessary to correct a current and ongoing constitutional violation at Tutwiler. Subsection III.C.2.ii provides a number of poorly defined factors to consider when developing a staffing plan and lacks any instruction on what constitutes adequate staffing. Even facing this challenge, the State implemented an updated iteration of those eleven factors into the staffing process. Indeed, the Internal Monitor noted, "The Consent Decree does not define 'adequate staffing,' but throughout the Reporting Period, ADOC continued to focus on recruiting and retaining officers to meet the staffing levels identified in the latest staffing analysis completed in November 2024." (Doc. 200-1 at 15). Thus, any further requirement

17

for the State to implement a plan that provides for an undefined standard of "adequate staffing levels" fails to pass muster under the PLRA.

Further, specific provisions contained in Section III.K. of the Consent Decree fail to provide attainable standards. The Consent Decree utilizes arbitrary deadlines that extend far beyond what is necessary to correct a current and ongoing constitutional violation at Tutwiler. For example, the specific 30-day time limit imposed by Sections III.K.8. (applying to sexual abuse and sexual harassment allegations) and III.K.16. (applying to SAIRC reviews) extend much further than is necessary to correct any current and ongoing constitutional violation at Tutwiler. The Internal Monitor described the language concerning the deadline in Section III.K.16. as "confusing and vague given certain allegations result in both an administrative investigation and a criminal investigation." (Doc. 200-1 at 67). Further, the 30-day deadline imposed by Section III.K.8. introduced its own, unnecessary, challenges. The Internal Monitor noted that "LESD requested extensions due to the technical difficulties with LESD's server, which resulted in the server being inaccessible for 46 days from December 20, 2024, through February 4, 2025." (Doc. 200-1 at 64). Because neither of the provisions concerning deadlines in Sections III.K.8. or III.K.16. pass the PLRA's needs-narrowness-intrusiveness mandate, Plaintiff cannot show that the continuation of those sections remains warranted under the PLRA.

18

## II.    THE STATE SATISFIED THE REMAINING PROVISIONS OF THE CONSENT DECREE.

Even if Plaintiff did not bear the weighty burden under the PLRA, the State's fulfillment of the Remaining Provisions of the Consent Decree further demonstrates the necessity of termination.  Under Section X. of the Consent Decree:

> This Agreement shall terminate when ADOC and Tutwiler have achieved substantial compliance with all of the substantive provisions of this Agreement in three consecutive Compliance Reports.

(Doc. 148-1 at 125).  In other words, the Consent Decree acknowledges that the State satisfies a substantive provision when it achieves substantial compliance with the substantive provision for three consecutive Monitoring Periods.  The Internal Monitor noted the continuation of "substantial compliance with the remaining 11 out of 11 chart sections."  (Doc. 200-1 at 9).  On September 12, 2024, the Internal Monitor submitted the Seventeenth Compliance Report, finding that the State achieved substantial compliance with all forty-four Compliance Tool sections but remained in partial compliance with the opening paragraph of Section III.C. concerning adequate staffing generally.  (Doc. 145-1).  On March 7, 2025, the Internal Monitor submitted the Eighteenth Compliance Report, finding that the State remained in substantial compliance with the remaining eleven sections of the Consent Decree, plus the opening paragraph to Section III.C. regarding staffing. (Doc. 161-1).  On July 29, 2025, the Internal Monitor submitted the Nineteenth

19

Compliance Report, finding the State remained in substantial compliance with all twelve sections of the Consent Decree.  (Doc. 177-1 and 177-2).  The Twentieth Compliance Report marks the third consecutive Compliance Report in which the Internal Monitor found the State in substantial compliance with all Remaining Provisions in the Consent Decree.  (Doc. 200-1 at 76).  Pursuant to Section X, the Consent Decree is subject to termination.

A.      **The State's Sustained Substantial Compliance with the Remaining Provisions Regarding Staffing.**

Section III.C. of the Consent Decree, entitled "Staffing," instructs the State to "ensure that correctional staffing and supervision is sufficient to adequately supervise inmates and staff and allow for the safe operation of Tutwiler" through compliance with Section III.C.'s two sub-sections: (1) Phase I and (2) Phase II. (Doc. 148-1 at 30-44).  As set forth below, the State demonstrated sustained substantial compliance with the provisions in both Section III.C.1. and Section III.C.2. for the last four Compliance Reports.  (Doc. 200-1 at 17-58).

i.      ***The State's Compliance with Section III.C.1. – Phase 1 Staffing Measures: Recruitment, Training, and Prison Rape Elimination Act ("PREA") Leadership Roles.***

Section III.C.1.i. of the Consent Decree directs the State to "continue to develop, submit to the Monitor and DOJ to assess for compliance with this Agreement, and implement its plan to recruit women correctional officers at Tutwiler," including (1) "[c]ontinue working with the Alabama Peace Officers

20

Standards and Training Commission (APOSTC) in screening, selecting, or hiring applicants for the entry-level corrections officer positions until such standards, or any other physical test employed, are: a. [v]alidated for a corrections environment; and b. [e]xamined for the necessity of gender-norming certain components;" (2) "[c]ontinue to conduct physical fitness assessments on all correctional officer trainees, to include the provision of training recommendations to meet APOSTC physical training requirements;" and (3) "[e]xamine workplace practices such as mandatory overtime and shift length to assess whether any of those practices may negatively impact hiring and retaining women candidates." (Doc. 148-1 at 30-32).

After determining many female staff found entry-level positions more attractive than the CO position because those roles did not obligate applicants to meet certain physical standards, the State contracted with Troy University's Department of Kinesiology and Health Promotion to develop a modified Physical Agility/Ability Test ("PAAT"), which APOSTC approved on February 27, 2024. (Doc. 200-1 at 18-19). COTs complete the PAAT within the first twenty-four hours of the Academy start date. (Id. at 19). COTs who do not meet the minimum standard receive an opportunity for a retest within 72 hours. (Id.). If the COT "does not achieve the minimum score on the retest," the Academy allows the COT up to six weeks to successfully pass the PAAT, provided the COT meets all other training requirements. (Id.). COTs "who fail to meet the PAAT minimum standard by the

21

six-week deadline will be removed from the academy." (Id.). In finding the State in substantial compliance with this provision, the Internal Monitor concluded that "[t]his model has proven successful in supporting hiring and retention efforts while ensuring COTs meet required physical readiness standards." (Id.). A COT's successful completion of a PAAT remains a requirement of passing the Academy. (Id.).

The State continues to review mandatory overtime and shift length to identify and assess any perceived negative impact on recruiting and retaining women as candidates for correctional staffing positions. After evaluating this subsection of the Consent Decree, the Internal Monitor stated, "[m]andatory overtime does not appear to be a significant impact on the retention or hiring of women candidates." The Internal Monitor observed that, "[d]espite initial concerns that extended work hours could deter women, data reviewed by the Internal Monitor (such as the increased candidates participating in the Academy and successful completion of PAAT) indicates that women continue to apply for, accept and remain in positions that require occasional mandatory overtime." (Doc. 200-1 at 20). Moreover, the Internal Monitor observed that the Annual Staffing Report dated July 29, 2023, through July 28, 2024, showed that overtime decreased by 8.05% from the previous report. (Id.). Thus, the State continues to maintain sustained substantial compliance with Sections

22

III.C.1.i.1., III.C.1.i.2., and III.C.1.i.3. of the Consent Decree.[3] (Doc. 200-1 at 18-21).

Section III.C.1.ii. of the Consent Decree instructs the State to "continue the practice of allowing officers from other ADOC facilities to serve overtime or otherwise be temporarily assigned at Tutwiler only after those officers have been trained." (Doc. 148-1 at 32). Tutwiler routinely allows officers from other facilities to work overtime at Tutwiler after the proper background check. (Doc. 200-1 at 21). Additionally, on September 1, 2025, eleven security staff members transferred from Kilby to Tutwiler to work a six-month rotation, with the option to remain at Tutwiler following the six-month rotation. (Id.). The Internal Monitor stated, "[the] addition of the 11 officers from Kilby, and the previous allowance of officers from other facilities working overtime at Tutwiler demonstrates the State's substantial compliance with Section III.C.1.ii." (Doc. 200-2 at 22). Further, Plaintiff agrees in its March 26, 2026, Status Report that the State achieved substantial compliance with Section III.C.1.ii. (Doc. 202 at 1).

Under Section III.C.1.iii. of the Consent Decree, the State must provide to the Internal Monitor and Plaintiff every six months "the numbers of men and women who have taken any required entry-level physical examination(s) and the results of

---

[3] Plaintiff does not mention in its March 23, 2026, Status Report whether it agrees with the Internal Monitor's finding of substantial compliance for Section III.C.1.i. (See Doc. 202 at 1).

23

any such tests broken down by gender for each test administration." (Doc. 148-1 at 32). A review of the Compliance Reports as far back as the Seventeenth Compliance Report shows the State maintains sustained substantial compliance with this section. In the Twentieth Compliance Report, the Internal Monitor observed that the numbers reported by the State since the Sixteenth Compliance Report demonstrate the State's substantial compliance with this provision, and that "the data supports an increase in interest to work at Tutwiler with stable numbers of those passing the PAAT." (Doc. 200-1 at 25). Additionally, Plaintiff agrees in its March 26, 2026, Status Report that the State sustained substantial compliance with Section III.C.1.iii. (Doc. 202 at 1).

Section III.C.1.iv.-v. of the Consent Decree instructs the State to "continue to employ an upper-level, Department-wide PREA Coordinator with sufficient time and authority to develop, implement, and oversee its efforts to comply with the PREA standards at Tutwiler," and Section II.C.1.v. directs the State to "designate a full-time (40 hours/week) PREA Compliance Manager who has no other duties within ADOC or Tutwiler and who is assigned to oversee PREA compliance at Tutwiler." (Doc. 148-1 at 33). Administrative Regulation ("AR") 454 allows for "a full-time statewide PREA Coordinator," and the State reported Ms. Christy Vincent served as the PREA Coordinator for nearly a decade and continues to do so. (Doc. 180 at 9). For more than a decade, Tutwiler has maintained an Institutional PREA

24

Compliance Manager ("IPCM"). (Doc. 180 at 10). During the last Monitoring Period, Tutwiler added a second IPCM for two full-time IPCMs, Ms. D'Jarra Mack and Ms. Kwatasia Hall, who report directly to the Warden and maintain responsibilities governed by Standard Operating Procedure ("SOP") 9-16. (Doc. 200-1 at 25). "ADOC's retention of Director Vincent as the ADOC-wide PREA Director and continued retention of at least one full-time Special Investigator-IPCM demonstrates [the State] continued substantial compliance with Sections III.C.1.iv.-v. of the Consent Decree." (Doc. 200-1 at 27). Further, Plaintiff agrees in its March 26, 2026, Status Report that the State attained substantial compliance with Section III.C.1.iv.-v. (Doc. 202 at 1).

Based on the State's actions stated above, the Internal Monitor found Tutwiler remained in substantial compliance with all provisions in Section III.C.1. for the past four Monitoring Periods. (Docs. 145-2 at 33;161-2 at 4; 177-2 at 4; 200-1 at 17-27). Thus, under the terms of the Consent Decree, these provisions remain ripe for termination. (Doc. 11 at 125).

> ### ii.   The State's Compliance with Section III.C.2. – Phase 2 Staffing Measures: Staffing Analysis, Staffing Plan, and Reporting.

Section III.C.2. contains ten subsections concerning correctional staffing at Tutwiler. Subsections III.C.2.i.-iv. instruct the State to "develop, document, and implement a staffing plan, based on gender responsive principles and PREA

25

requirements, that provides for adequate staffing levels and, where applicable, video monitoring, to protect inmates against sexual abuse and sexual harassment." (Doc. 148-1 at 34-35). As to video monitoring, the Internal Monitor observed that the State "installed and upgraded cameras at Tutwiler to expand coverage in key living and medical areas." (Doc. 200-1 at 27). Section III.C.2.ii. instructs the State to consider eleven different criteria when "calculating adequate staffing levels." (Doc. 148-1 at 35-37). In compliance with the Consent Decree, "ADOC created and implemented AR 238, Resource Planning, which created the Resource Planning Unit ("RPU") to update the Department's staffing analysis," which includes the eleven criteria:

1. Generally accepted detention and correctional practices;

2. ADOC and Tutwiler's determination of which necessary duties will be handled by Tutwiler staff, ADOC staff, or outside agencies;

3. Any findings of inadequacy from any investigative agencies within ADOC;

4. Any findings of inadequacy from internal or external oversight bodies;

5. The camera management plan and all components of the facility's physical plant;

6. The composition of the inmate population;

7. The number and placement of supervisory staff;

8. Institution programming and options for supervision of inmates;

9. A Tutwiler specific shift relief-factor;

26

> 10. Any applicable state or local laws, regulations, or standards; and
>
> 11. The prevalence of substantiated and unsubstantiated incidents of sexual abuse and sexual harassment.

(Doc. 200-1 at 28). In the RPU's November 2024, the State identified and confirmed the eleven staffing-analysis factors of Section III.C.2.ii. in November 2024 staffing analysis. (Id.). The Internal Monitor concluded that these factors include the PREA regulations discussed in Section III.C.2.iv. (Id.). The updated November 2024 staffing analysis, released by ADOC's RPU, incorporated gender-responsive principles, PREA regulations, DOJ Consent Decree provisions, emerging correctional best practices, and a 1.67 shift-relief factor. (Id. at 29). On December 11, 2025, Tutwiler "updated its Staffing Plan (SOP 9-6)." (Id. at 27). "Taken together, the 2024 Staffing Analysis and SOP 9-6, fulfill the requirements of Section III.C.2.i. through Section III.C.2.v." (Doc. 200-1 at 29).

Section III.C.2.vi. of the Consent Decree instructs the State to submit quarterly staffing reports to the Internal Monitor and DOJ. (Doc. 148-1 at 38). "The Internal Monitor reviewed Tutwiler's staffing updates that covered the period of January 1, 2025, through June 30, 2025" and concluded that the Staffing Update Report identifies information from the Consent Decree, and ADOC continues reporting the necessary information demonstrating its continued substantial compliance with Section III.C.2.vi. of the Consent Decree. (Doc. 200-1 at 29, 30).

27

Section III.C.2.vii. of the Consent Decree instructs Tutwiler to provide the Internal Monitor and DOJ a staffing report every six months that reports the following information:

1.   An evaluation of existing staffing levels and need for adjustments;

2.   A listing of each post and position needed;

3.   The number of hours needed for each post and position;

4.   A listing of staff by gender, working overtime at Tutwiler; and

5.   Tutwiler's assessment of its ability to comply with the staffing plan.

(Doc. 148-1 at 38-39). "In accordance with the Consent Decree, ADOC continues to provide this staffing report [to the Internal Monitor and DOJ] on an annual basis." (Doc. 200-1 at 30). Therefore, the State maintained substantial compliance with the provisions of Section III.C.2.vii. of the Consent Decree maintaining a substantial compliance status. (Id. at 31).

Subsections III.C.2.viii.-x. concern policies for hiring Tutwiler staff and volunteers. (Doc. 148-1 at 39-44). As early as the Third Compliance Report, the State promulgated policies AR 454 and SOP 8-12 to comply with these provisions. (Doc. 26-1 at 42). ADOC and Tutwiler continue to follow policy (AR 454, SOP 8-12) that includes the provisions of the Consent Decree. (Doc. 200-2 at 13). For Section III.C.2.viii. of the Consent Decree, the State must develop and implement a

28

policy that includes the following:

> That ADOC and Tutwiler not hire or promote, or enlist the services of anyone who may have contact with inmates, and shall not enlist the services of any contractor who may have contact with inmates at Tutwiler, who: (1) has engaged in sexual abuse or sexual harassment in a prison, jail, lockup, community confinement facility, juvenile facility, or other institution; (2) has been convicted of engaging or attempting to engage in sexual activity in the community facilitated by force, overt or implied threats of force, or coercion, or if the victim did not consent or was unable to consent or refuse; or (3) has been civilly or administratively adjudicated to have engaged in the activity described in this section.

(Doc. 148-1 at 39-41). The Internal Monitor concluded, "ADOC [AR] 454 'Inmate Sexual Abuse and Harassment' covers all aspects of Section III.C.2.viii." (Doc. 200-1 at 31). The Internal Monitor concluded, "Thus, ADOC's policies and practices related to the hiring of new employees and conducting background checks demonstrate ADOC's continued compliance with Section III.C.2.viii." (Id. at 31). Additionally, according to the Internal Monitor, "Tutwiler's Staffing Update Report for the compliance period January 1, 2025, through June 30, 2025, revealed a total of fourteen new staff members." (Id. at 29). The State maintains these policies and sustains substantial compliance with Sections III.C.2.viii.-x. (Doc. 200-2 at 13-14). Plaintiff also agrees in its March 26, 2026, Status Report that the State achieved

29

substantial compliance with Section III.C.2.ix.-x.[4]  (Doc. 202 at 1).

The State also implemented innovative plans to increase staffing at Tutwiler, as well as other ADOC facilities.   In August 2024, the State launched the ACTIVATE Program in collaboration with the Alabama Community College System to prepare potential candidates for success at the APOSTC Academy.  (Doc. 200-1 at 56).  Tutwiler received thirteen ACTIVATE graduates since the program's inception.  (Id. at 57).  Other strategies include "frequent statewide 'one-stop-shop' hiring events, strengthened onboarding and performance evaluation through the [Field Training Officer] programs, expanded training pipelines such as ACTIVATE, and targeted process reforms that remove known barriers to entry…alongside wellness- and culture-focused retention measures under 2024-2027 Women's Services Strategic Plan."   (Id. at 58).   "The above data [from the Twentieth Monitoring Period] reflects sustained and measurable progress in Tutwiler's staffing levels that algins with, and is driven by, ADOC's ongoing, institutionalized recruitment and retention initiatives."  (Id. at 57).  "Collectively, these coordinated

---

[4] In its March 26, 2026, Status Report, Plaintiff agrees the State maintains substantial compliance "for several Consent Decree provisions concerning staffing (C.1.ii-v, **C.2.viii**-x)" but then contends the State has "not substantially complied with the Consent Decree's overall staffing requirement and provisions requiring continuing analysis and staffing improvements (C, C.2.i-**viii**)."  (Doc. 202 at 1) (emphasis added).  Thus, it remains unclear whether Plaintiff agrees or disagrees with the Internal Monitor's finding of substantial compliance for Section III.C.2.viii.  (See id.).

efforts demonstrate that ADOC established durable systems that continue to stabilize staffing and support ongoing recruitment and retention at Tutwiler." (Id. at 58).

Based on policy changes and creative efforts to increase staffing, the State achieved and maintains sustained substantial compliance with Section III.C.2. for the past four Monitoring Periods. (See Chart 1, infra 40).

**B.      The State's Sustained Substantial Compliance with the Remaining Provisions Regarding Investigations.**

Section III.K. of the Consent Decree, entitled "Investigations and Referrals," directs the State to "ensure that all allegations of sexual abuse and sexual harassment are promptly, thoroughly, and objectively investigated and appropriately referred for prosecutorial review, and that alleged victims are advised of the outcome of their allegations." (Doc. 148-1 at 84). Section III.K. contains ten subsections that remained following the October 2024 termination: Sections III.K.2., III.K.5., III.K.6., III.K.7., III.K.8., III.K.9., III.K.12., III.K.14., III.K.15., and III.K.16. (Doc. 148-1 at 84-93). As set forth below, since the commencement of monitoring, the State continues to maintain substantial compliance with the Remaining Provisions regarding investigations and referrals.[5]

---

[5] Notwithstanding the fact the State maintained substantial compliance for the past nineteen Monitoring Periods, the Plaintiff-approved PREA auditor found the State in compliance in the 2025 ADOC Correctional Facilities PREA Auditor Findings Report: Tutwiler; 2022 ADOC Correctional Facilities PREA Auditor Findings Report: Tutwiler; 2019 ADOC Correctional Facilities PREA Auditor Findings Report: Tutwiler; and 2016 ADOC Correctional Facilities PREA Auditor Findings

31

### i.    The State's Compliance with Section III.K.2. – Prompt, Thorough, and Objective Investigations.

Section III.K.2. of the Consent Decree states, "[w]hen ADOC conducts its own investigations into allegations of sexual abuse or sexual harassment, it shall do so promptly, thoroughly, and objectively for all allegations, including third party and anonymous reports." (Doc. 148-1 at 84-85). Tutwiler initially achieved substantial compliance with this section in the Second Compliance Report and continues to maintain that level of compliance today. (See Chart 2, infra 40-41). In the Twentieth Compliance Report, the Internal Monitor "received and reviewed the LESD Case Review Report which provides an overview of the status of each investigation transpired during the" Monitoring Period. (Doc. 200-1 at 58). "The LESD Case Review Report listed 189 total allegations …, [and] [o]f these 189 allegations and investigations, LESD investigated 167 allegations of sexual abuse and sexual harassment at Tutwiler." (Id.). "The IPCM investigated the remaining 22 inmate-on-inmate sexual harassment allegations." (Id.). Therefore, the State "investigated all 189 total allegations in compliance with Section [II]I.K.2. of the Consent Decree." (Id.).

Even with the Internal Monitor's finding of substantial compliance, in an effort to address timeliness and process clarity, LESD undertook corrective steps

Report: Tutwiler. (See Prison Rape Elimination Act 2003 (PREA), ALA. DEP'T OF CORRS. https://doc.alabama.gov/prea.aspx).

32

and expanded oversight, including dedicating three full-time agents and one back-up agent to Tutwiler investigations; providing comprehensive training, including trauma-informed interviewing, evidence preservation, and credibility-assessment materials; and implementing a new administrative form to document investigative steps and escalation to criminal investigation when warranted. (Doc. 180 at 14–15). Accordingly, the Internal Monitor found Tutwiler in substantial compliance with Section III.K.2. in the Twentieth Compliance Report, and the preceding Compliance Reports by both the External and Internal Monitors also found substantial compliance for this Section. (see Chart 2, infra 40-41).

> ii.    *The State's Compliance with Section III.K.5.-7. – Specialized Training for Investigators, Evidence Collection and Preservation, and Individualized Credibility Assessments.*

Section III.K.5. of the Consent Decree instructs the State to provide specialized training to its investigators. (Doc. 148-1 at 86-87). Tutwiler's LESD investigators attend the specialized training for investigating sexual abuse and harassment, and, further, the LESD investigators attended a refresher training on April 4, 2025. (Doc. 200-1 at 62-63). As with the previous nineteen Compliance Reports, the External and Internal Monitor found Tutwiler in substantial compliance with Section III.K.5. (see Chart 2, infra 40-41). Additionally, Plaintiff agrees in its March 23, 2026, Status Report that the State sustained substantial compliance with Section III.K.5. (Doc. 202 at 1).

33

Section III.K.6. of the Consent Decree directs investigators to collect and preserve direct and circumstantial evidence including physical evidence, DNA evidence, and electronic monitoring data.  (Doc. 148-1 at 87).  Further, Section III.K.6. mandates investigators to interview the alleged victim, suspect, and any witnesses, and review any prior reports of sexual abuse or harassment involving the suspect.  (Id.). The Internal Monitor confirmed, as with all previous Compliance Reports, LESD investigators conducted staff-on-inmate sexual abuse and harassment investigations and inmate-on-inmate sexual abuse investigations in compliance with this provision.  (Doc. 200-1 at 63).  The Internal Monitor reported that, for the investigations reviewed in the Twentieth Compliance Report, the information reflected compliance with Section III.K.6's provisions for appropriately gathering and preserving evidence.  (Id.).  Consequently, the External and Internal Monitors found the State in sustained substantial compliance with Section III.K.6. for the past nineteen Monitoring Periods.  (see Chart 2, infra 40-41).

Section III.K.7. of the Consent Decree discusses the role of investigators to perform credibility assessments of the alleged victim, suspect, and any witnesses on an individualized basis.  (Doc. 148-1 at 87).  The State trains LESD investigators to assess credibility based on individual factors such as consistency of statements, corroborating evidence, contemporaneous reporting, demeanor, and any motive to fabricate, and to document the reasoning supporting credibility assessments in the

34

investigative report. (Doc. 200-1 at 63-64). Further, as requested by Plaintiff, the State directed LESD investigators to complete additional training on conducting credibility assessments recommended by Plaintiff's consultants. (Doc. 200-1 at 59-60). The investigative reports reviewed by the Internal Monitor "demonstrate[d] that LESD continues to assess the credibility of alleged victims, suspects, and witnesses on an individual basis." (Id. at 63). In addition, LESD created a template to assist investigators with completing reports that "includes a 'Disposition' section which expounds on the preponderance of the evidence and the credibility assessment." (Id.at 63-64). The Internal Monitor concluded that LESD "agents continue to maintain neutrality throughout the process," and "the Internal Monitor did not detect any appearance of bias" in the LESD agents' interviews. (Id.). Thus, the External and Internal Monitors found the State in sustained substantial compliance with Section III.K.7. starting with the Second Compliance Report. (see Chart 2, infra 40-41). Further, Plaintiff agrees in its March 23, 2026, Status Report that the State achieved substantial compliance with Section III.K.7. (Doc. 202 at 1).

> ### iii. The State's Compliance with Section III.K.8.-9., 12., 14.-15. – Timely Written Investigative Reports, Investigative Summary Sheets and Documentation, Written Notice to Inmates of Investigative Outcomes, and Notice to Inmates of Staff Perpetrator Status Changes.

Section III.K.8. of the Consent Decree states, "ADOC shall issue a written investigative report within 30 days after the conclusion of a sexual abuse or sexual

35

harassment investigation that indicates whether the allegation is substantiated, unsubstantiated, or unfounded.  The investigator may request in writing, approved by the facility designee, an extension for cause that identifies the remaining actions necessary to complete the investigation." (Doc. 148-1 at 88).  During the Twentieth Monitoring Period, "LESD requested approval for 8 extensions of the 69 investigative reports reviewed by the Internal Monitor…, [and] ADOC provided approval for all 8 extensions."  (Doc. 200-1 at 64).  "For these reasons, ADOC remains compliant with Section III.K.8. of the Consent Decree."  (Id. at 64-65).  The Internal Monitor found the State in substantial compliance with Section III.K.8. for the past nineteen Compliance Reports.  (see Chart 2, infra 40-41).

Section III.K.9. of the Consent Decree instructs the investigator to prepare an investigative summary sheet.  (Doc. 148-1 at 88-89).  "[T]he Internal Monitor received the LESD Case Review Report that gives an overview of the current status of each investigation transpired during [the] [Monitoring] Period."  (Doc. 200-1 at 65). As such, "ADOC remains complaint with Section III.K.9. of the Consent Decree."  (Id.).  The External and Internal Monitors found the State in substantial compliance with Section III.K.9. for the past nineteen Compliance Reports.  (see Chart 2, infra 40-41).  Plaintiff further agrees in its March 23, 2026, Status Report that the State achieved substantial compliance with Section III.K.9.  (Doc. 202 at 1).

Section III.K.12. of the Consent Decree instructs the investigator to notify the

36

inmate as to whether the allegation maintains a status of substantiated, unsubstantiated, or unfounded. (Doc. 148-1 at 89-90). LESD creates an "Inmate Reporting Letter" advising the inmates of the outcome of the investigation. (Doc. 200-1 at 65). The IPCM then delivers the letter to the inmate, thereby notifying the inmate of the status of the investigation. (Id.). "The Internal Monitor confirmed that 62 of 64 LESD investigations contained an Inmate Report Letter." (Id.). Therefore, "ADOC remains compliant with Section III.K.12. of the Consent Decree." (Id. at 66). The External and Internal Monitors found the State in substantial compliance with Section III.K.12. for the past nineteen Compliance Reports. (see Chart 2, infra 40-41). Also, Plaintiff agrees in its March 23, 2026, Status Report that the State achieved substantial compliance with Section III.K.12. (Doc. 202 at 1).

Section III.K.14. of the Consent Decree directs the investigator to notify the inmate of any staff member changes such as the staff member's removal from the post, the staff member's termination, or the staff member's indictment or conviction. (Doc. 148-1 at 90). In addition, Section III.K.15. of the Consent Decree directs the investigator to document such notifications or attempted notifications. (Id. at 91). To satisfy these provisions, the State created a form titled "Staff Re-assigned Moved Off Post," which notifies an inmate that the State reassigned that staff member to another post following a PREA allegation, a staff member left the State's employment, or when the State learns the staff member has been indicted or

37

convicted on a charge related to sexual abuse within Tutwiler. (Doc. 200-1 at 66). During the last Monitoring Period, "[a] total of 39 investigations required a Staff Re-Assigned Moved Off Post form and ADOC completed 33." (Id.). "Based on this information, the Internal Monitor [found] ADOC remains compliant with Section III.K.14. and Section III.K.15. of the Consent Decree." (Id. at 66-67). The External and Internal Monitors found the State in substantial compliance with Section III.K.14. and Section III.K.15 for the past nineteen Compliance Reports. (see Chart 2, infra 40-41). Plaintiff, in addition, agrees in its March 23, 2026, Status Report that the State achieved substantial compliance with Section III.K.14 and Section III.K.15. (Doc. 202 at 1).

Accordingly, the Internal Monitor confirmed the State's substantial compliance with Sections III.K.8.-9., III.K.12., and III.K.14.-15. (see Chart 2, infra 40-41).

### iv. The State's Compliance with Section III.K.16. – Sexual Abuse Incident Review Committee.

Section III.K.16. of the Consent Decree states, "[a] review team, including upper-level management officials at Tutwiler, with input from line supervisors, investigators, and medical and mental health practitioners, shall conduct an incident review within 30 days of the conclusion of every investigation of substantiated and unsubstantiated allegations of sexual abuse or staff-on-inmate sexual harassment." (Doc. 148-1 at 91). The State created the Sexual Abuse Incident Review Committee

38

("SAIRC") to satisfy this provision, and the External and Internal Monitors found the State in substantial compliance with Section III.K.16. beginning with the Second Compliance Report and continuing and continuing through the Twentieth Report. (see Chart 2, infra 40-41). The SAIRC convenes for unsubstantiated allegations and substantiated allegations within thirty days of the conclusion of an investigation. (Doc. 200-1 at 67). Therefore, "[t]he Internal Monitor finds no significant work left to be done in relation to the timely completion of SAIRC reviews and finds ADOC and Tutwiler in substantial compliance with the provisions of Section III.K.16. of the Consent Decree." (Id. at 69-70). The External and Internal Monitors confirmed the State's substantial compliance with Section III.K.16. for nineteen Compliance Reports. (see Chart 2, infra 40-41). Additionally, Plaintiff agrees in its March 23, 2026, Status Report that the State achieved substantial compliance with Section III.K.16. (Doc. 202 at 1).

C.     The State's Sustained Substantial Compliance with the Remaining Provisions – Compliance Chart.

The Consent Decree defines "substantial compliance" as "material compliance with most or all components of the relevant provision of the Agreement." (Doc. 148-1 at 8). It further provides, "[t]his agreement shall terminate when ADOC and Tutwiler have achieved substantial compliance with all of the substantive provisions of this Agreement in three consecutive Compliance Reports." (Doc. 148-1 at 125). Chart 1 below illustrates the Internal Monitor's findings for the

last four Compliance Reports for all staffing provisions (July 1, 2023, through June 30, 2025):

*Chart 1: Compliance Findings for Staffing Provisions*

| Monitor's Finding - Substantial Compliance | Provision | |
|---|---|---|
| | III.C.1 | III.C.2 |
| 17th (Doc. 145-2) | X | X |
| 18th (Doc. 161-2) | X | X |
| 19th (Doc. 177-2) | X | X |
| 20th (Doc. 200-2) | X | X |

Chart 2 below illustrates the External and Internal Monitors' findings for the last nineteen Compliance Reports for all investigation provisions (January 1, 2016, through June 30, 2025):

*Chart 2: Compliance Findings for Investigation Provisions*

| Monitor's Finding - Substantial Compliance | Provision | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | III.K.2 | III.K.5 | III.K.6 | III.K.7 | III.K.8 | III.K.9 | III.K.12 | III.K.14 | III.K.15 | III.K.16 |
| 2nd (Doc. 22-2) | X | X | X | X | X | X | X | X | X | X |
| 3rd (Doc. 26-1) | X | X | X | X | X | X | X | X | X | X |
| 4th (Doc. 27-2) | X | X | X | X | X | X | X | X | X | X |
| 5th (Doc. 28-1) | X | X | X | X | X | X | X | X | X | X |
| 6th (Doc. 29-1) | X | X | X | X | X | X | X | X | X | X |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 7th (Doc. 34-2) | X | X | X | X | X | X | X | X | X | X |
| 8th (Doc. 37-1) | X | X | X | X | X | X | X | X | X | X |
| 9th (Doc. 39-2) | X | X | X | X | X | X | X | X | X | X |
| 10th (Doc. 43-1 at 10) | X | X | X | X | X | X | X | X | X | X |
| 11th (Doc. 53-1 at 10-11) | X | X | X | X | X | X | X | X | X | X |
| 12th (Doc. 57-1 at 11-12) | X | X | X | X | X | X | X | X | X | X |
| 13th (Doc. 61-1 at 11) | X | X | X | X | X | X | X | X | X | X |
| 14th (Doc. 78-1 at 12-13) | X | X | X | X | X | X | X | X | X | X |
| 15th (Doc. 102-1) | X | X | X | X | X | X | X | X | X | X |
| 16th (Doc. 118-2) | X | X | X | X | X | X | X | X | X | X |
| 17th (Doc. 145-2) | X | X | X | X | X | X | X | X | X | X |
| 18th (Doc. 161-2) | X | X | X | X | X | X | X | X | X | X |
| 19th (Doc. 177-2) | X | X | X | X | X | X | X | X | X | X |
| 20th (Doc. 200-2) | X | X | X | X | X | X | X | X | X | X |

Accordingly, the External and Internal Monitor's findings demonstrate the State's substantial compliance with the Remaining Provisions, thereby satisfying the Consent Decree's termination standard.

## CONCLUSION

For the reasons discussed above, the State respectfully requests that the Court terminate the Consent Decree pursuant to the PLRA, 18 U.S.C. § 3626(b)(1)(A)(i), and the terms of the Consent Decree regarding Tutwiler.

41

Dated this 10th day of April 2026.

[SIGNATURE ON NEXT PAGE]

/s/ William R. Lunsford
William R. Lunsford
*One of the Attorneys for ADOC*
*and the State*

William R. Lunsford
Kenneth S. Steely
Megan M. Everett
Lynette E. Potter
**BUTLER SNOW LLP**
200 West Side Square
Suite 100
Huntsville, AL 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
kenneth.steely@butlersnow.com
megan.everett@butlersnow.com
lynette.potter@butlersnow.com

43

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, by the Court's CM/ECF system on this 10th day of April 2026:

James Joseph DuBois
**U. S. ATTORNEY'S OFFICE**
P.O. Box 197
Montgomery, AL 36101
Telephone: (334) 223-7280
james.dubois2@usdoj.gov

*Attorney for Plaintiff*

Stephen D. Wadsworth
**U. S. ATTORNEY'S OFFICE**
131 Clayton Street
Montgomery, AL 36104
Telephone: (334) 223-7280
Stephen.Wadsworth@usdoj.gov

*Attorney for Plaintiff*

Kerry Krentler Dean
**U.S. DEPARTMENT OF JUSTICE**
**CIVIL RIGHTS DIVISION**
950 Pennsylvania Avenue NW
4con, 10th Floor
Washington, DC 20530
Telephone: (202) 532-5816
kerry.k.dean@usdoj.gov

*Attorney for Plaintiff*

Christopher N. Cheng
**U.S. DEPARTMENT OF JUSTICE**
**CIVIL RIGHTS DIVISION**
4 Constitution Square
150 M. Street NW
Suite 10.1128
Washington, DC 20530
Telephone: (202) 353-5012
Christopher.Cheng@usdoj.gov

*Attorney for Plaintiff*

Ashley N. Light
**U.S. DEPARTMENT OF JUSTICE**
**CIVIL RIGHTS DIVISION**
**SPECIAL LITIGATION SECTION**
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 718-2258
Ashley.Light@usdoj.gov

*Attorney for Plaintiff*

*/s/ William R. Lunsford*
Of Counsel

44