**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 2:15-cv-00368-MHT-CWB** |
| **STATE OF ALABAMA AND ALABAMA DEPARTMENT OF CORRECTIONS,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

**UNITED STATES' RESPONSE TO THE STATE'S
MOTION TO TERMINATE THE CONSENT DECREE**

The United States remains committed to protecting women in prisons from sexual violence, including through the measured use of court-ordered remedies when necessary. Accordingly, the United States of America does not oppose the Defendants the State of Alabama's and Alabama Department of Corrections' (State) Motion to Terminate Consent Decree substantive provisions III.C.1.i-v, C.2.viii-x, and K. 2, 5-9, 12, 14-16 (Eliminated Provisions). The State's Motion to Terminate Consent Decree, Doc. 207 (April 10, 2026) (Motion); Consent Decree, Doc. 11 (June 18, 2015) (Consent Decree). However, the United States opposes the State's Motion to terminate Consent Decree provisions III.C (introductory first paragraph only) and C.2.i-vii (Continuing Provisions).

The Court should deny the State's Motion with respect to the Continuing Provisions because the State's Eighth Amendment violations are current and ongoing. These violations involve severe staffing deficiencies which place prisoners at potential risk of serious harm from sexual abuse, harassment, and misconduct (sexual abuse). For the Continuing Provisions, the

Court has sufficient grounds to deny in part the Motion without an evidentiary hearing. If the Court has concerns about whether relief remains necessary, however, the Court should hold an evidentiary hearing and adopt an expedited discovery and hearing process so the United States may address such concerns.

## I.    BACKGROUND

This case involves a Consent Decree designed to address sexual abuse in the Julia Tutwiler Prison for Women. For most of the case history, the State worked with the United States to implement reforms, gradually reducing the Court's oversight through late 2024, when the United States agreed to terminate most of the Consent Decree. Doc. 207 at 2-6; Order Terminating Portions of Consent Decree, Doc. 152 (Oct. 4, 2024); *see also* Opinion and Order, Doc. 113 (October 27, 2023) (transition plan and appointment of Internal Monitor). The United States agreed to replace an independent outside monitor with an Internal Monitor, who is a former Tutwiler warden. Since the 2024 termination of most of the Consent Decree's substantive requirements, the United States has continued trying to work in good faith with the State. Even now, the United States continues to assess the State's efforts fairly, and the United States does not contest termination of provisions that are in substantial compliance. The State, however, seeks to terminate several remaining provisions that still are critical to protecting Tutwiler prisoners and which have long been a challenge for the State's compliance efforts.[1] The law and facts of this case require the Court's continued oversight of the Continuing Provisions. The State's Motion

---

[1] In its Memorandum, Doc. 208, n.1, the State contends that the United States did not follow proper procedures to challenge findings by the State's Internal Monitor. This provision only applies if the United States had moved for contempt or otherwise tried to enforce the Consent Decree, which it has not. Doc. 11, IX, X. The United States has not sought enforcement by contempt or other means authorized by the Consent Decree. If the State had not moved to terminate prematurely, the United States would still be following the regular compliance process to address violations without the Court's involvement. In any case, the United States routinely provided notice to the State of our concerns through compliance tour exit briefings, correspondence, and filings. *See, e.g.*, United States' Statements Regarding the Status of the Consent Decree, Docs. 163, 202.

presents an inflection point to tailor the remaining provisions of the decree and focus on only what remains necessary to remedy remaining issues for constitutional conditions.

## II.   PLRA REQUIREMENTS AND THE UNITED STATES' RECOMMENDED PROCEDURE FOR RESOLVING A PLRA MOTION TO TERMINATE.

Under the PLRA, "[P]rospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).

The PLRA, itself, does not define "current and ongoing."  18 U.S.C. 3626(g).  The Webster dictionary definition for "current" includes "occurring in or existing at the present time . . . presently elapsing . . . [and] most recent."  Merriam-Webster.com (2026) (https://www.merriam-webster.com/dictionary/current).  "Ongoing" means "being actually in process" or "continuing."  *Id.* (https://www.merriam-webster.com/dictionary/ongoing).

In *Cason v. Seckinger*, the Eleventh Circuit explained that the "current and ongoing" requirement means that a court should retain relief if there is a "presently existing violation."  231 F.3d 777, 783-784 (11th Cir. 2000).  In PLRA terms, a court should not dismiss relief if a constitutional violation presently exists.  18 U.S.C. 3626(b)(3).  Additionally, if plaintiff objects to termination, a Court should conduct an evidentiary hearing before dismissal.  *Cason* at 781-782. The State has not requested an evidentiary hearing and is apparently confident that the existing record already warrants termination.  The State also has not invoked the termination procedures of the Consent Decree itself.  Notably, *Cason* does not address whether a court can *retain* a consent decree without a hearing.  If the Court intends to retain relief, the Count must only provide specific written findings which support such relief.  18 U.S.C. § 3626(b)(3).

PLRA case law suggests that a court may make findings without a full trial.  At minimum, the court may consider admissions and uncontested facts to streamline the process.  *Laube v. Campbell*, 333 F. Supp. 2d 1234 (M.D. Al. 2004).  Such streamlining may be particularly appropriate here, because an extensive monitor reporting process and Consent Decree stipulations already evidence non-compliance with constitutional standards.  A neighboring circuit court recently addressed a consent decree in a similar procedural posture and offered additional guidance.  Defendants in that case challenged a decree despite their years of non-compliance.  On appeal, the Circuit Court noted that "a court may rely on illustrative incidents rather than an "exhaustive[] catalog" of the evidence to establish unconstitutional conditions.  *United States v. Hinds County Board of Supervisors*, 128 F.4th 616, 626 (5th Cir. 2025) (*citing Alberti v. Klevenhagen*, 790 F.2d 1220, 1225 (5th Cir. 1986)).  When reviewing relief orders for PLRA compliance, a District Court has "wide latitude" and "must look back some period of time" for context.  *Id*. at 627, n.5.  "Deliberate indifference, for example, can be established via evidence showing notice of a problem from many years ago."  *Id.* (*citing Gates v. Cook*, 376 F.3d 323, 341 (5th Cir. 2004) (holding that a failure to address a problem known to be "urgent for more than a decade" supports the finding of deliberate indifference)).[2]

As discussed in more detail below, illustrative incidents, admissions, and an extensive record already demonstrate current and ongoing violations of federal law related to the Continuing Provisions.

---

[2] *Gates* involves a Fifth Circuit case, but the law is still relevant because the Fifth Circuit was split to form the Eleventh Circuit.  94 Stat. 1994 (1980).  While a 2004 decision may only be persuasive, earlier Fifth Circuit *Gates* decisions about prisoner rights are still authoritative in this Circuit.  Failing to protect prisoners for years, and refusing to implement promised remedies, despite ample notice from the United States, shows both objective and subjective indifference to prisoner safety.

The Court should therefore immediately deny in part the State's Motion regarding the Continuing Provisions, if the Court agrees with the United States that the record justifies retaining this relief. If the Court however finds that additional evidence is needed to assess the State's Motion, the United States suggests the Court order an expedited discovery and hearing process. The process should include: (1) an evidentiary hearing, (2) an exchange of witness lists, including designation of any proposed expert witnesses, (3) an exchange of expert witness curricula vitae and a short summary of their anticipated testimony, (4) production of any documents which may be used at the hearing which have not already been produced, (5) production of the State's newest staffing analysis, staffing reports, and investigations of sexual abuse or harassment, created since July 1, 2025, and (6) an expedited timeline for requesting admissions.[3] The United States suggests that the evidentiary hearing should last no longer than three days. This streamlined process will mitigate the potential delays while narrowing the issues in dispute.[4]

### III.   THE STATE CONTINUES TO VIOLATE TUTWILER PRISONERS' CONSITUTIONAL RIGHT TO SAFETY.

In a protection-from-harm case like this one, the Eighth Amendment's "deliberate indifference" standard establishes a right to "humane conditions of confinement [and] prison officials . . . must 'take reasonable measures to guarantee the safety of the inmates,'" *Farmer v. Brennan*, 511 U.S. 825, 832-833 (1994) (citations omitted). Prison officials are "deliberately

---

[3] While the United States agrees that the Court can terminate the investigation provisions in Consent Decree Section K, the actual reports are still relevant to assessing whether inadequate staffing continues to harm or pose a risk of harm to the prisoners. Fed. R. Evid. 401, 402. In other words, the United States agrees that the State has improved the quality of its investigative process sufficient to warrant termination of Section K. However, nothing in this response should suggest that the United States waives any right to documents, including investigation reports, which may be relevant to any relief retained by the Court.

[4] If the Court cannot decide the motion in 30 days, the PLRA includes an automatic stay, which the United States will ask the Court to stay in a separate filing. 18 U.S.C. § 3626(e). The original compliance schedule for this case included additional monitoring activities for the period from July 1, 2025, through December 31, 2025. The United States sent the State a pending document request for this period. This more recent information could help with the Court's PLRA analysis. If the Court needs a hearing to decide the Motion, the Court should allow the United States to at least obtain the additional documents, and the need for the documents serves as "good cause" for postponing the stay.

indifferent" if they fail to protect prisoners from "conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (*citing Helling v. McKinney,* 509 U.S. 25, 35 (1993)). In other words, a state must take action to prevent assaults and dangerous conditions, because "officials are not free to let the state of nature take its course." *Farmer* at 833-834.

The State suggests that this case involves only "potential future violations," and termination is required when the violation is too theoretical. Doc. 208 at 14, citing *Cason* at 783. This language from *Cason* is only dicta; the constitutional right to relief in that case—like this one—has never been based on "future violations." Tutwiler's deficiencies are current conditions that pose an ongoing risk of serious harm. In this protection-from-harm case, inadequate staffing and inadequate supervision are   exactly the types of violations which are prohibited by federal law. As recently as January 16, 2025, a State Sexual Abuse Incident Review substantiated a rape allegation against a *prison supervisor*. Bates ADOC-Tutwiler 009062-09103 (Case No. 24-1479). This incident is particularly relevant because the investigation also revealed broader supervision deficiencies. The State's Internal Monitor never acknowledged the severity of this incident, but she did reference it in her reports. The incident is known to the parties and the court and is illustrative. Nineteenth Monitor's Report, Doc. 177-1 at 48.

In sum, the Court should retain oversight where constitutional violations exist. The lack of staffing and proper supervision at Tutwiler directly reflect a deliberate indifference to inmate safety and harm, matters that State officials have failed to adequately address, as required by federal law.[5]

---

[5] The PLRA only speaks of "terminating relief," not dismissal, and the PLRA does not define "termination." 18 U.S.C. § 3626(b). If the Court decides not to dismiss this case in its entirety and retains some relief, the Court may have some discretion about how it "terminates" the remaining Section K provisions. The United States suggests that the Court consider a conditional dismissal of the remaining Terminated Provisions. *See* Fed. R. Civ. P. 41(a)(2) (dismissal by court order may be on "terms that the court may consider proper"). Given how recently the state implemented improvements to its investigation process, and Internal Monitor admissions of continuing delays, server problems, and other investigative deficiencies, the Court should consider a conditional dismissal where it retains jurisdiction

**A.     Failing to provide adequate security staffing and supervision violates the prisoners' constitutional rights when unreasonably unsafe conditions result.**

The Continuing Provisions require security and staffing necessary to prevent sexual abuse within Tutwiler prison.  Doc. 11.C, C.2.i-vii.[6]

The State's Memorandum includes numerous admissions about inadequate staffing levels, that foster unsafe conditions in the prison.  *See, e.g.,* Doc 208 at 17 (35.2% vacancy rate).  While the State claims that staffing is adequate, these claims are conclusory and contradicted by the facts related to the Continuing Provisions.   The United States urges the Court to independently determine whether those facts warrant relief from those provisions.  *See, also,* Doc. 11, IX.B (Court retains enforcement jurisdiction and the authority to provide relief).[7]  As discussed below, the facts show that staffing vacancy rates remain high, even compared to historical data, and these vacancies affect positions considered critical to the safety and security of the prison by the State's own analysis.

The Internal Monitor's most recent report includes staffing data that undermines the State's motion.  Tutwiler Prison has a staffing rate of less than 65% of its identified positions.  The prison has a staff vacancy rate of more than 35%, meaning the prison is missing more than one in three

---

over the Terminated Provisions for a period of time to ensure the State does not immediately relapse.  The PLRA does not appear to bar such a condition.  Indeed, the PLRA treats "private settlement agreements" favorably in that it expressly permits stipulated remedies which are not enforceable except by reinstatement of a civil proceeding, *Compare* 18 U.S.C. 3626(g)(1) and (g)(6). The State may not stipulate to conditions of dismissal, but the PLRA does not appear to necessarily bar such conditions.  The Court could also of course make PLRA findings to justify the conditions, in which case the dismissal order itself would comply with the PLRA on its face.

[6] This dispute is not about staffing in general, as the Consent Decree does not address staffing for an array of prison needs, such as medical transport and work programs.  This is another distinction between the Tutwiler relief and PLRA cases cited by the State.  Cf. Memo at 12-14 (*citing Cason* supra; *Brown v. Plata*, 563 U.S. 493 (2011)).  Unlike other PLRA cases, Tutwiler's current posture is a result of a long enforcement history with extensive discussion and revision of remedies based on specific circumstances.   The focus of the remaining provisions is basic prisoner safety, particularly safety from sex abuse.  Notably, the Supreme Court upheld more extensive safety requirements in the *Brown* case, including a population cap.

[7] Every analysis conducted for this case shows that Tutwiler's vacancy rate is high both in absolute terms and based on the facility's specific needs.  The State's suggestion that the Court consider staffing shortages across the country is irrelevant to the constitutional standard.  Whether some other employer has trouble finding staff does not alleviate the State's obligation to retain enough staff to prevent serious harm to prisoners.

7

potential staff members that have been identified as necessary for the smooth, efficient, and safe operation of the facility. Remarkably, this vacancy rate is almost 15% higher than in 2021, when the staff vacancy rate was 21.6%. Doc. 200-1 at 44-45.[8] In other words, the State has allowed prison staffing to deteriorate significantly over time, increasing the risk of harm to inmates in the process. The overall vacancy rate does not fully describe how bad the staffing situation really is at Tutwiler. In an effort to fill positions, Tutwiler has been lowering standards for security staff. According to the Internal Monitor's report, only 46 of 140 security positions, less than one third, are filled by certified, full-time, correctional officers or senior correctional officers. Thirty-three of the security positions are filled by trainees (almost 25%). Thirty-five positions are held by non-certified security guards or cubicle officers (25%). The vacancy rate for the cubical officers is 80%. *Id*. In other words, without a single rebuttal expert, the United States can already show that Tutwiler's actual staffing is well below the State's own staffing plans, and many of the personnel on staff are inexperienced and, in part, unqualified. As the Parties know from long experience at Tutwiler, this leaves inmates at risk of harm, in violation of their constitutional rights and in violation of Federal law.

The State's position is further weakened by what is NOT addressed by the Internal Monitor. The State has notably ignored whether Tutwiler fills the most critical posts in the facility. These are the posts that the State's own policies and staffing analysis acknowledge *must* be filled because of their high importance for maintaining the security and safety of inmates. *See* Administrative Regulation 238 (available at https://doc.alabama.gov/docs/AdminRegs/AR238.pdf). For example, cubicles contain monitors for the camera system. Logically, an 80% vacancy rate for cubicle

---

[8] The State may seek to compare Tutwiler's overall vacancy rate to other systems. The Tutwiler rate appears

8

officers will have a substantial, negative impact on the facility's ability to remotely monitor and, thereby, protect inmates from harm.

The State's recent remedial efforts are unreasonable and inadequate given the severity of its staffing and supervision deficiencies. Again, the State's admissions undermine their defenses and arguments. The State's decision to move staff from Kilby prison to supplement Tutwiler staffing is an example. Doc. 208 at 28. This purported "remedy," which robs Peter to pay Paul, does not prove that the State has taken reasonable, sustainable measures to address unsafe conditions at Tutwiler. It is instructive that the State waited until right before filing its motion to take the expedient step of transferring staff from one prison to another. The Court and the United States are left to question whether the State would take an equally expedient step of transferring such staff back to Kilby in the event its motion is granted. To give the most recent last minute improvements context, the Court should consider the history of State compliance efforts. The State took years to implement some improvements to salaries, basic report documentation, and upgrading cameras. The Court should consider this full history when evaluating the State's latest efforts and when making PLRA findings about the Consent Decree's staffing requirements. The purpose of the Consent Decree is to achieve sustainable improvements in the conditions at Tutwiler. Such improvements have not yet been made by the State.

**B.    Failing to provide adequate security supervision and staffing contravenes federal law and policy incorporated into the Consent Decree.**

The Consent Decree incorporates specific federal laws which give force to constitutional standards and federal policy. Specifically, the Consent Decree's staffing requirements incorporate standards and processes adopted by the Prison Rape Elimination Act and its implementing regulations. Doc. 11, C.2.i; 34 U.S.C. § 30301; 28 C.F.R. pt. 115; *cf*, *Farmer* 511 U.S. at 832 (rape and violence serves no penological purpose).

9

When Congress enacted the Prison Rape Elimination Act, Congress directed the creation of standards, which ultimately included one which mandated implementation of a staffing plan designed to prevent sexual abuse and other violence.  28 C.F.R. §115.13. Providing adequate staffing based on a careful analysis of a prison's needs is therefore foundational requirement of the PREA.  The State understood this requirement when it agreed to the Consent Decree, developed a staffing plan, and promised to implement the plan. *See, e.g.,* PREA Standards 115.13 (supervision and monitoring including compliance with an adequate staffing plan); *compare* Doc. 11, C.  While PREA remedies do not necessarily establish a constitutional floor, the parties agreed that the remedies now in dispute were necessary to remedy both PREA and constitutional violations found at Tutwiler.  Doc. 11, XII.[9]  When the State entered the Consent Decree, it also acknowledged that it can be bound by this concession in litigation *with the United States*.  *Id*.  The State remains bound by this concession.

### C.   The Consent Decree's remaining staffing and investigation requirements comply with the PLRA's need, narrowness, and intrusiveness standard.

Even if current and ongoing violations exist, the State suggests that the Court should still strike all remaining Consent Decree provisions because the State asserts that they do not comply with PLRA limits on the scope of such remedies.  Doc. 208 at 20-23; 18 U.S.C. 3626(b)(3) (relief for current and ongoing violation must "extend[] no further than necessary . . . is narrowly drawn and the least intrusive means to correct the violation . . . need, narrowness, intrusiveness" standard).  Narrowing to only the Continuing Provisions would achieve this PLRA goal.

The Continuing Provisions comply with the PLRA.  When the Court entered the original Consent Decree, the parties agreed that all the remedies met Prison Litigation Reform Act, 18

---

[9] The Consent Decree incorporated the United States' complaint and original investigative findings to provide context for the PLRA stipulation. Doc. 11, XII.

U.S.C. § 3626 requirements. The Court also expressly found that the remedies in question complied with the PLRA when it approved the Consent Decree. Doc. 11, XII. Whether this history creates any presumption, law of the case, or formal admission, is less relevant than the fact that it can be considered as part of the record for PLRA findings. The parties have already narrowed relief in this case by eliminating most other Consent Decree provisions. The Continuing Provisions match the narrow scope of the remaining issues necessary to protect inmates from harm, consistent with their constitutional rights.

Finally, the State's challenge to the scope of relief relies heavily on case law that is not particularly applicable to Tutwiler. The cases cited in the State's Memorandum mostly involve consent decrees that did not meet PLRA requirements at the onset of the PLRA proceedings. *See, e.g.,* Doc. 208 at 14, *citing Guajardo v. Tex. Dep't of Crim. Just.,* 363 F.3d 392, 395 (5th Cir. 2004). Such precedents provide only limited guidance here, because the Tutwiler Consent Decree included a PLRA stipulation, which specifically referenced the claims and facts alleged by the United States during its investigation. The State now claims that these remedies are too broad or excessive to comply with the PLRA. The State gives no explanation or valid basis for its argument. As such, the Court has no justification for holding that long-accepted, mutually agreed conditions and remedies are now somehow inconsistent with the PLRA.

## IV. CONCLUSION

The Court should dismiss the Eliminated Provisions and deny the State's Motion with respect to the Continuing Provisions. Consistent with the PLRA, the Court also should make written findings to explain its decision to retain the Continuing Provisions. If the Court decides to hold an evidentiary hearing to decide the Motion, the Court should allow expedited, limited discovery.

11

Respectfully submitted on April 24, 2026.


FOR THE UNITED STATES


/s/ Christopher N. Cheng
PA Bar #69066

Christopher N. Cheng
Ashley N. Light
Trial Attorneys
**U.S. DEPARTMENT OF JUSTICE**
**SPECIAL LITIGATION SECTION**
**CIVIL RIGHTS DIVISION**
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 353-5012
christopher.cheng@usdoj.gov


Stephen Wadsworth
Assistant United States Attorney
**UNITED STATES ATTORNEY'S OFFICE**
**MIDDLE DISTRICT OF ALABAMA**
131 Clayton Street
Montgomery, AL 36104
Office: (334) 551-1714
Stephen.Wadsworth@usdoj.gov


*Attorneys for Plaintiff*

12

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing United States' Response to the State's Motion to Terminate the Consent Decree has been served via CM/ECF on all parties this 24th day of April 2026:


William R. Lunsford
Matthew B. Reeves
Kenneth S. Steely
Megan M. Everett
Lynnette E. Potter
Butler Snow LLP
200 West Side Square, Suite 100
Huntsville, Alabama 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
matt.reeves@butlersnow.com
kenneth.steely@butlersnow.com
lynette.potter@butlersnow.com
megan.everette@butlersnow.com


/s/ Christopher N. Cheng
*Attorney for Plaintiff*

13